GILBERT R. SEROTA (No. 75305)
Email:  gserota@howardrice.com
JIN H. KIM (No. 208676)
Email:  jkim@howardrice.com
JEREMY T. KAMRAS (No. 237377)
Email:  jkamras@howardrice.com
HOWARD RICE NEMEROVSKI CANADY
     FALK & RABKIN
A Professional Corporation
Three Embarcadero Center, 7th Floor
San Francisco, California  94111-4024
Telephone:     415/434-1600
Facsimile:     415/217-5910

Attorneys for Defendants
WELLS FARGO & COMPANY, WELLS FARGO
FUNDS MANAGEMENT, LLC, AND WELLS
FARGO FUNDS TRUST

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

| | |
|---|---|
| EDWARD LEE, EDWARD ARSENAULT, EMIL DE BACCO, RICHARD HINTON, ARNOLD KREEK, and MARGRET MACHT, Individually And On Behalf Of All Others Similarly Situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>WELLS FARGO & COMPANY, WELLS FARGO FUNDS MANAGEMENT, LLC, and WELLS FARGO FUNDS TRUST,<br><br>          Defendants. | No. 08-CV-1830 WHA<br><br>Action Filed:   April 4, 2008<br><br>NOTICE OF MOTION AND MOTION OF DEFENDANTS WELLS FARGO & COMPANY, WELLS FARGO FUNDS MANAGEMENT, LLC, TO DISMISS AMENDED COMPLAINT; MEMORANDUM OF POINTS AND <u>AUTHORITIES IN SUPPORT OF MOTION</u><br><br>Date:       February 26, 2009<br>Time:       2:00 pm<br>Dept:       Courtroom 9, 19th Floor<br><br>Trial Date:    TBD |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ........................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................... 1

INTRODUCTION ......................................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED ............................................ 2

ARGUMENT ................................................................................................ 2

I.  THIS ACTION IS BARRED BY THE STATUTE OF LIMITATIONS. ........ 2

    A.  All Putative Class Members Were On Inquiry Notice More Than Two Years Before This Action Was Filed. ........ 2

    B.  The Siemers Action Did Not Toll The Statute Of Limitations. ........ 7

II.  IN ANY EVENT, THE STATUTE OF REPOSE BARS CLAIMS BASED ON ALLEGED MISREPRESENTATIONS OR OMISSIONS MADE MORE THAN FIVE YEARS BEFORE THE ACTION WAS FILED. ........ 9

III.  PLAINTIFFS FAIL TO PROPERLY ALLEGE THAT THE PURPORTED OMISSIONS AND MISREPRESENTATIONS WERE MATERIAL. ........ 9

IV.  PLAINTIFFS FAIL TO ALLEGE THAT THEY RELIED ON DEFENDANTS' PROSPECTUSES AND SAIS. ........ 12

    A.  Plaintiffs Have Not Pleaded That They Read The Prospectuses Or SAIs At Issue. ........ 12

    B.  The Fraud-On-The-Market Exception Is Not Applicable. ........ 13

    C.  The *Ute* Exception Does Not Apply. ........ 13

V.  PLAINTIFFS FAIL TO PROPERLY ALLEGE THAT DEFENDANTS ACTED WITH THE REQUISITE SCIENTER. ........ 14

    A.  The Inference That Defendants Acted Without An Intention To Deceive Or Defraud Investors Is More Compelling Than An Inference Of Scienter. ........ 17

        1.  Despite The Widespread Practice Of Revenue-Sharing, The SEC Never Established An Obligation To Disclose Its Existence. ........ 17

        2.  The Complaint's Allegations Show No Intent To Deceive. ........ 19

VI.  PLAINTIFFS FAIL TO ALLEGE WITH PARTICULARITY THAT THE FEES WERE EXCESSIVE UNDER *GARTENBERG*. ........ 20

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1

**TABLE OF CONTENTS**

2

                                                                                            **Page**

3       VII.    PLAINTIFFS FAIL TO ALLEGE ANY LOSSES OR DAMAGES
                THAT ARE RECOVERABLE UNDER RULE 10B-5.                                         22
4
                A.     "Excessive Fees" Are Not Recoverable Under Rule 10b-5.                  23
5
                B.     Brokerage Churning Cases Are Inapposite.                                23
6
                C.     Plaintiffs Fail To Plead Their Losses With Specificity.                 24
7
        CONCLUSION                                                                             25
8

9

10

11

12

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972)   12, 13

*Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974)   7

*Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338 (2d Cir. 2006)   21, 22

*Andrews v. Orr*, 851 F.2d 146 (6th Cir. 1988)   7

*Basch v. Ground Round, Inc.*, 139 F.3d 6 (1st Cir. 1998)   8

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)   9, 12, 14

*Benzon v. Morgan Stanley Distrib., Inc.*, 420 F.3d 598 (6th Cir. 2005)   10

*Berckeley Investments Group, Ltd. v. Colkitt*, 455 F.3d 195 (3rd Cir. 2006)   18

*Berry v. Valence Tech., Inc.*, 175 F.3d 699 (9th Cir. 1999)   3

*Betz v. Trainer Wortham & Co., Inc.*, 519 F.3d 863 (9th Cir. 2008)   2, 5, 9

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975)   13

*Castillo v. Dean Witter Discover & Co.*, No. 97 Civ. 1272(RPP), 1998 WL 342050 (S.D.N.Y. June 25, 1998)   16

*Catholic Soc. Servs., Inc. v. INS*, 232 F.3d 1139 (9th Cir. 2000)   7

*Clegg v. Cult Awareness Network*, 18 F.3d 752 (9th Cir. 1994)   13

*Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983)   7

*DeBenedictis v. Merrill Lynch & Co., Inc.*, 492 F.3d 209 (3d Cir. 2007)   5

*Dura Pharm. v. Broudo*, 544 U.S. 336 (2005)   22, 23

*Eckstein v. Balcor Film Investors*, 58 F.3d 1162 (7th Cir. 1995)   14

*Follansbee v. Davis, Skaggs & Co., Inc.*, 681 F.2d 673 (1982)   23, 24

*Gartenberg v. Merrill Lynch Asset Management*, 694 F.2d 923 (2d Cir. 1982)   20

*Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736 (9th Cir. 2008)   15

*Gray v. First Winthrop Corp.*, 82 F.3d 877 (9th Cir. 1996)   5

*Griffin v. Singletary*, 17 F.3d 356 (11th Cir. 1994)   8

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

**TABLE OF AUTHORITIES**

Page(s)

*Grimes v. Donald*, 673 A.2d 1207 (Del. 1996), *overruled on other grounds*, 746 A.2d 244 (Del. 2000) ... 21

*Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767 (9th Cir. 1984) ... 24

*Hoffman v. UBS-AG*, —F. Supp. 2d—, No. 05 Civ 6817LBS, 2008 WL 4684168 (S.D.N.Y Oct. 22, 2008) ... 10, 11, 16, 18, 21, 22

*In re AIG Advisor Group Sec. Litig.*, No. 06 CV 1625(JG), 2007 WL 2750676 (E.D.N.Y. Sept. 20, 2007) ... 10, 11

*In re Am. Funds Sec. Litig.*, 556 F. Supp. 2d 1100 (C.D. Cal. 2008) ... 3, 5, 6

*In re Coca-Cola Enters. Sec. Litig.*, 510 F. Supp. 2d 1187 (N.D. Ga. 2007) ... 11

*In re Daou Sys.*, 411 F.3d 1006 (9th Cir. 2005) ... 22

*In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407 (D.N.J. 2005) ... 5

*In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008) ... 22

*In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1106 (C.D. Cal. 2003) ... 3

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208(RO), 2006 WL 1008138 (S.D.N.Y. April 18, 2006) ... 9, 15, 16, 18

*In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309 (8th Cir. 1998) ... 12

*In re Pfizer Inc. Sec. Litig.*, —F. Supp 2d—, No. 04 Civ. 9866(LTS) (DCF), 2008 WL 2627131 (S.D.N.Y. July 1, 2008) ... 12

*In re Salomon Smith Barney Mut. Fund Fees Litig.*, 528 F. Supp. 2d 332 (S.D.N.Y. 2007) ... 21, 22

*In re Stac Elec. Sec. Litig.*, 89 F.3d 1399 (9th Cir. 1996) ... 5

*In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173 (N.D. Cal. 2004) ... 13

*In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986 (N.D. Cal. 2007) ... 9

*Johnson v. Tellabs*, 262 F. Supp. 2d 937 (N.D. Ill. 2003) ... 11

*Jones v. Harris Associates, LP*, 527 F.3d 627 (7th Cir. 2008) ... 20

*Korwek v. Hunt*, 827 F.2d 874 (2d Cir. 1987) ... 7, 8

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008) ... 15, 22, 24

*Mihara v. Dean Witter Co.*, 619 F.2d 814 (9th Cir. 1980) ... 23

HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN
*A Professional Corporation*

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3  *Miller v. Thane Int'l, Inc.*, 519 F.3d 879 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 161
4     (Oct. 6, 2008) ................................................................................................ 9

5  *Nesbitt v. McNeil*, 896 F.2d 380 (9th Cir. 1990) .............................................. 24

   *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th
6     Cir. 2007) ...................................................................................................... 22

7  *Press v. Quick & Reilly, Inc.*, 218 F.3d 121 (2nd Cir. 2000) ........................... 18

8  *Robbin v. Fluor Corp.*, 835 F.2d 213 (9th Cir. 1987) ................................... 7, 9

9  *Rubke v. Capitol Bancorp Ltd.*, —F.3d—, No 07-15083, 2009 WL 69278 (9th Cir.
10    Jan. 13, 2009) ................................................................................................ 15

   *Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334 (5th Cir. 1985) .... 7
11
   *Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d 525 (9th Cir. 1986) ............... 24
12
   *Sheppard v. Capital One Bank*, No. CV 06-7535 GAF, 2007 WL 5405188 (C.D.
13    Cal. July 11, 2007) .......................................................................................... 7

14 *Shores v. Sklar*, 647 F.2d 462 (5th Cir. 1981) ............................................... 14

15 *Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2006 WL 2355411 (N.D.
      Cal. Aug. 14, 2006) ................................................................................... 12, 13
16
   *Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6
17    (1971) ........................................................................................................... 23

18 *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ...... 14, 15

19 *Ulferts v. Franklin Res., Inc.*, 567 F. Supp. 2d 678 (D.N.J. 2008) ...... 13, 16, 18

20 *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605 (7th Cir. 1995) .......... 3

21 *Yang v. Odom*, 392 F.3d 97 (3d Cir. 2004) .................................................. 7, 9

22 *Zucco Partners, LLC v. Digimarc Corp.*, —F.3d—, No. 06-35758, 2009 WL 57081
      (9th Cir. Jan. 12, 2009) ........................................................................ 14, 15, 16
23

24

**Statutes**

25 15 U.S.C.
      §78u-4(a)(3)(A)(i) ............................................................................................. 4
26    §78u-4(b)(2) .................................................................................................... 15

27 15 U.S.C. §80(a)-2(a)(9) ................................................................................. 21

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

DEFENDANTS' MOTION TO DISMISS                    08-CV-1830 WHA

–v–

# TABLE OF AUTHORITIES

**Page(s)**

28 U.S.C.
    §1658(b)(1)      2
    §1658(b)(2)      9

## Other Authorities

5 *Moore's Federal Practice*, §23.65[1][c] (3d ed. 2008)      8

J. Coates & R. Hubbard, *Competition In The Mutual Fund Industry: Evidence And Implications For Policy*, 33 J. Corp. L. 151 (2007)      20

SEC Amicus Brief, *Cohen v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 2000 WL 34447852 (2d Cir., filed Feb. 14, 2000)      17

SEC, *Proposed Rules*, 69 F.R. 9726 (Mar. 1, 2004)      17

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

### NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on February 26, 2009 at 2:00 p.m., or as soon thereafter as the matter may be heard, before the Honorable William H. Alsup, in courtroom 9, 19th floor of the Court indicated above, located at 450 Golden Gate Avenue, San Francisco, California, Defendants Wells Fargo & Company, Wells Fargo Funds Management, LLC, and Wells Fargo Funds Trust, will and hereby do move the Court for an order dismissing the Amended Class Action Complaint For Violation Of The Federal Securities Laws and each and every cause of action asserted therein, with prejudice.

This Motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that the Complaint is barred by the statute of limitations and, in any event, fails to state a claim for which relief can be granted. This Motion is based on this Notice Of Motion And Motion, the following Memorandum Of Points And Authorities, the Request For Judicial Notice and attached exhibits filed herewith, and such other and further papers and argument as may hereafter be presented.

### MEMORANDUM OF POINTS AND AUTHORITIES
#### INTRODUCTION

As a result of rampant abuse, Congress adopted and the Courts have enforced stringent pleading standards for putative federal securities class actions. Those standards are not met by measuring the length of the complaint or by consideration of redundant pleading of irrelevant facts, conclusions without factual support, or hyperbole. Instead, the rules require specific factual pleading of each and every element required of a cause of action. That is precisely what is missing from the Complaint at issue here. Several of the fundamental elements of a 10b-5 cause of action are not pleaded with the requisite facts and specificity, including materiality, scienter, reliance, loss causation and, for the unique theory espoused here, the excessiveness of the mutual fund fees allegedly extracted from each fund by Defendants. Instead of pleading these facts, the Complaint resorts to subterfuge, papering the pleading with irrelevancies, lengthy quotations without meaning, and conclusions without factual support.

But the Court need not even reach these substantive pleading deficiencies because the entire action is barred by the statute of limitations, as shown by facts of which the Court can take judicial notice.

## STATEMENT OF ISSUES TO BE DECIDED

1.     Should this action be dismissed as untimely under the statute of limitations because all putative class members were on inquiry notice more than two years before the action was filed, or at a minimum, should the class period be shortened to comply with the statute of repose?

2.     Should this action be dismissed because the Complaint fails to properly plead a violation of Rule 10b-5, including the elements of materiality, reliance, scienter, and loss causation, or that the revenue-sharing fees were "excessive"?

## ARGUMENT

## I.     THIS ACTION IS BARRED BY THE STATUTE OF LIMITATIONS.

Plaintiffs assert only two claims:  that (1) Wells Fargo Funds Management, LLC ("WFFM") and Wells Fargo Funds Trust violated Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b-5 thereunder; and (2) Wells Fargo & Company violated Section 20(a) of the 1934 Act.  Amended Class Action Complaint For Violation Of The Federal Securities Laws ("Complaint" or "FAC") ¶¶256-270.  These claims are governed by a two-year statute of limitations (28 U.S.C. §1658(b)(1)) that begins to run when the alleged misstatement or omission was discovered or should have been discovered.  *Betz v. Trainer Wortham & Co., Inc.*, 519 F.3d 863, 874-76 (9th Cir. 2008).  Therefore, "inquiry notice, and not merely actual notice, can cause the statute of limitations for securities fraud to begin to run." *Id*. at 875.

### A.     All Putative Class Members Were On Inquiry Notice More Than Two Years Before This Action Was Filed.

"A plaintiff is on inquiry notice when there exists sufficient suspicion of fraud to cause a reasonable investor to investigate the matter further." *Id*. at 876.  This is a low threshold: "Plaintiffs need not . . . have fully discovered the nature and extent of the fraud before they [are] on notice that

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

something may have been amiss." *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1106, 1119 (C.D. Cal. 2003) (quotation marks and citation omitted). Because "[a] reasonable investor is presumed to have information available in the public domain" (*Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 610 (7th Cir. 1995)), "[c]ourts can impute knowledge of public information without inquiring into when, or whether, individual shareholders actually knew of the information in question." *Berry v. Valence Tech., Inc.*, 175 F.3d 699, 703 n.4 (9th Cir. 1999). In the case of press releases and news articles, where there is a "reasonable nexus between the allegations made in the article[s] and the nature of the action subsequently brought," such "article[s] [] put shareholders on inquiry notice." *Id*. at 705.

Here, Plaintiffs were on inquiry notice no later than December 2005—more than two years before this action was filed—because there was sufficient publicly available information to have raised the requisite suspicion of fraud in any reasonable investor. This information includes:

*Public Disclosures by NASD.* On June 8, 2005, the NASD announced that it had fined 15 brokers, including Wells Fargo affiliates, in connection with its "efforts to eliminate conflicts of interests in the sale of mutual funds." Defendants' Request For Judicial Notice In Support Of Motion To Dismiss ("RJN") Ex. A at 1.[1] The NASD press release explained that the brokers "operated 'preferred partner' or 'shelf space' programs" and that "[t]he mutual fund complexes that participated in these programs paid extra fees"—which the release also referred to as "revenue sharing fees"—for this "enhanced visibility." *Id*. The release further asserted that the fund complexes "use[d] assets of the mutual funds instead of their own money to meet the[se] revenue sharing obligations." *Id*. The NASD again made this information public in its monthly report of "Disciplinary and Other NASD Actions" (*Id*., Ex. B at D17-D18), and major media outlets, including the *Los Angeles Times*, *Associated Press*, *MarketWire*, and *PR Newswire*, carried the story. *Id*., Exs. MM-PP. Plaintiffs concede they were on inquiry notice as of the date of the NASD

---

[1]On a motion to dismiss, a court may consider documents attached to the complaint; documents to which the complaint refers or on which the claims rely and whose authenticity is not questioned; and documents subject to judicial notice, including the court's orders and records, press releases, news articles and industry reports, government publications, and filings with regulatory agencies. *See In re Am. Funds Sec. Litig.*, 556 F. Supp. 2d 1100, 1102 (C.D. Cal. 2008).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    press release, which they incorporate into the Complaint under the heading: "**THE TRUTH**

2    **BEGINS TO BE DISCLOSED**."  FAC ¶246.[2]

3        *The Siemers Action and Related Press*.  Plaintiffs in the *Siemers* Action filed their first

4    complaint on November 4, 2005.  RJN Ex. Z.  Plaintiffs made the complaint available on counsel's

5    website (*see id*., Ex. AA at Ex. B), and publicized it in a "widely circulated national business-

6    oriented publication or wire service" (15 U.S.C. 78u-4(a)(3)(A)(i)) on November 11, 2005.  RJN Ex.

7    AA, ¶3 & Ex. B.  They did so via the same wire service that this Court later approved for use in

8    providing publication notice of the class settlement.  *See id*., Ex. BB, ¶10 (referring to *id*., Ex. CC,

9    ¶4(a)(vi)); *see also id*., Ex. DD, ¶4.  The press release was also carried by the *Associated Press*.  *Id*.,

10   Ex. D.  Over the following two months, plaintiffs released substantially the same press release at

11   least 19 additional times.  *Id*., Exs. E-W.  These press releases disclosed core allegations in the

12   *Siemers* Action that are substantially identical to those here:

13       The action also includes a subclass of persons who held any shares of Wells Fargo
         Mutual Funds.  The complaint additionally alleges that the investment advisor
14       subsidiary of Wells Fargo, Wells Fargo Funds Management, created further undisclosed
         material conflicts of interest by entering into revenue sharing agreements . . . . The
15       investment advisors financed these arrangements by illegally charging excessive and
         improper fees to the fund that should have been invested in the underlying portfolio.
16       (*Id.*, Ex. AA at Ex. B; *compare, e.g.*, FAC ¶2)

17       *SEC Filing*.  On December 1, 2005, Wells Fargo filed the *Siemers* complaint with the SEC

18   (RJN Ex. FF), after which it was publicly accessible through this additional source.

19       *Public Disclosure by Wells Fargo*.  In December 2005, Wells Fargo issued a "Disclosure

20   Statement," wherein it acknowledged that WFFM had made revenue-sharing payments in exchange

21   for "enhanced access," which "payments and compensation arrangements [were] in addition to the

22   sales charges and fees that are disclosed in the fee tables, prospectuses and statements of additional

23   information."  FAC ¶247 (emphasis omitted).  In the *Siemers* Action, plaintiffs alleged that "the full

24   extent of Defendants' conflicts of interests were revealed" when this document was "publicly

25

26       [2]Plaintiffs in the *Siemers* Action likewise believed that they were then on inquiry notice:  the
     class period ended on June 8, 2005 (RJN Ex. X, ¶2)—the same date the NASD release was issued—
27   and, in the Second Amended Complaint, they alleged that "[t]he truth about Wells Fargo's kickback
     arrangement started to be revealed on June 8, 2005."  *Id*., Ex. Y, ¶63.

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   circulated" in December 2005.   RJN Ex. Y, ¶65.   Here again, Plaintiffs allege this document

2   disclosed that WFFM had made the payments at issue, that the payments created a potential conflict

3   of interests, and that they had not been previously disclosed.  FAC ¶247; *see also id.* ¶241.

4          These disclosures were "sufficiently probative of fraud . . . to incite [the putative class

5   members] to investigate."  *Betz*, 519 F.3d at 876 (quotations marks and citation omitted).   Plaintiffs

6   in the *Siemers* Action admitted as much:  "The filing of the Complaint in [the *Siemers* Action] in

7   November 2005, and the publication of notice of the Complaint pursuant to the [PSLRA], as well as

8   subsequent press releases regarding decisions rendered by this Court, created additional public

9   awareness of Defendants' wrongdoing."  RJN Ex. X, ¶259.

10         Once an investor is on inquiry notice, the statute of limitations begins to run when "the

11  investor, in the exercise of reasonable diligence, should have discovered the facts constituting the

12  alleged fraud."  *Betz*, 519 F.3d at 876.  This is so even if the putative class members did not in fact

13  undertake any further investigation or discover the alleged fraud.  *Id.*; *see also Gray v. First

14  Winthrop Corp.*, 82 F.3d 877, 881 (9th Cir. 1996).  Had the putative class members exercised even

15  minimal diligence they would have discovered any alleged fraud.  *DeBenedictis v. Merrill Lynch &*

16  *Co., Inc.*, 492 F.3d 209, 218-19 (3d Cir. 2007) (a "reasonable investor of ordinary intelligence, with

17  the exercise of reasonable diligence, would have discovered the basis of the claims" regarding the

18  fee structure of mutual fund classes and possible broker conflicts of interest, as of time he possessed

19  the funds' registration statements, NASD press releases, and related news articles).

20         Plaintiffs in the *Siemers* Action were able to deduce the alleged fraud and file a nearly

21  identical action in November 2005—a fact that irrefutably establishes that the putative class

22  members here should have discovered the alleged fraud well more than two years before they filed

23  this action.  *See, e.g., In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1411 (9th Cir. 1996) (affirming

24  dismissal of securities claims on ground that "plaintiffs were clearly aware of or suspected fraud at

25  the time they filed their first complaint"); *accord In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp.

26  2d 407, 419 (D.N.J. 2005).

27         *In re American Funds Securities Litigation*, 556 F. Supp. 2d 1100 (C.D. Cal. 2008), is directly

28  on point:  There, a putative class alleged, as had a prior class action, that American Funds had

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1  charged "excessive management and marketing fees" to finance undisclosed revenue-sharing in

2  violation of federal securities laws, including Rule 10b-5.  *Id*. at 1101.  Relying on Ninth Circuit

3  authority, the court held that the putative class members had been on inquiry notice, and in the

4  exercise of reasonable diligence, should have discovered any fraud, more than two years before the

5  litigation had commenced in December 2006.  *Id*.  In finding that plaintiffs were on inquiry notice,

6  the court relied upon the following factors, all of which are equally present here:  (1) *plaintiffs'*

7  *admission* in their own complaint that "'[t]he truth [that Defendants were violating various securities

8  laws] was partially disclosed' . . . when NASD fined and censured [Defendants]" (*id*. at 1104;

9  *compare* FAC ¶246); (2) *publicly available news articles*, which years before the action was filed,

10  had "focus[ed] on the activities of the defendants named in this case and on the same payments that

11  are the center of their alleged wrongdoing" (*In re Am. Funds*, 556 F. Supp. 2d at 1105);

12  (3) *regulatory proceedings*, including the SEC's "industry-wide investigation of the very practices at

13  issue in this case," which was "a matter of public record" beginning in 2003 (*id*. at 1102; *see also id*.

14  at 1107; *compare, e.g.*, FAC ¶¶4, 134, 144-45, 168-69); and (4) *a prior class action* that "allege[d] a

15  nearly identical scheme of wrongdoing against Defendants."  *In re Am. Funds*, 556 F. Supp. 2d at

16  1108 (emphasis omitted).

17     The court concluded that plaintiffs should have discovered the alleged fraud at least two years

18  before the complaint was filed, relying on the facts noted above and emphasizing the fact that "other

19  similarly-situated investors . . . were able to investigate and bring a substantively similar complaint

20  by mid-2004, well over two years earlier."  *Id*. at 1111.

21     The court's rationale in *American Funds* applies equally here.  By December 2005, if not

22  earlier, the putative class members in this action were on inquiry notice, and through the exercise of

23  due diligence, should have discovered the facts underlying the claims now asserted.  They might

24  have filed the present action shortly after the June 1, 2007 class certification order in the *Siemers*

25  Action, which substantially limited the class.  Instead, they did not initiate this follow-on litigation

26  until April 2008 and therefore more than two years after the state of limitations began to run.

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

DEFENDANTS' MOTION TO DISMISS                    08-CV-1830 WHA

**B.     The *Siemers* Action Did Not Toll The Statute Of Limitations.**

From the point when a putative class action is filed until a decision on class certification is rendered, applicable statutes of limitations are tolled for those putative class members who, in the event certification is denied as to them, thereafter seek to intervene as *individual* plaintiffs (*Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974)) or file *individual* actions.  *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354 (1983).  Neither the Supreme Court nor any circuit court has extended the *American Pipe* tolling doctrine to cases like this one.  Rather, the Ninth Circuit has held that if certification of a putative class is denied, the statute of limitations is ***not*** tolled for a follow-on *class* action, as here, in which plaintiffs effectively "seek[] to relitigate the correctness of that denial."  *Catholic Soc. Srvs., Inc. v. INS*, 232 F.3d 1139, 1147 (9th Cir. 2000); *see also id*. at 1149 (permitting tolling, but distinguishing case from that where plaintiffs "attempt[ed] to relitigate an earlier denial of class certification, or to correct a procedural deficiency").  Where a class action "sought to relitigate the issue of class certification and thereby circumvent the earlier denial" (*id*. at 1147), the Ninth Circuit therefore refused to afford the class the benefit of the tolling doctrine and, instead, affirmed the dismissal of the follow-on class action as untimely.  *Robbin v. Fluor Corp.*, 835 F.2d 213, 214 (9th Cir. 1987).  District courts within the Ninth Circuit have followed suit.  *Sheppard v. Capital One Bank*, No. CV 06-7535 GAF, 2007 WL 5405188, at *4 (C.D. Cal. July 11, 2007) ("[Ninth] circuit case law, including *Catholic Social Services*, indicate[s] that the statute of limitations as to the class claims in this case should not be tolled" because "[p]laintiff is attempting to correct the proposed [national] class's procedural deficiencies").

Other circuits also have refused to apply the tolling doctrine in circumstances like those here.[3]

---

[3]*Korwek v. Hunt*, 827 F.2d 874, 879 (2d Cir. 1987) ("the tolling doctrine enunciated in *American Pipe* does not apply to permit a plaintiff to file a subsequent class action following a definitive determination of the inappropriateness of class certification"); *Yang v. Odom*, 392 F.3d 97, 112 (3d Cir. 2004) ("hold[ing] that *American Pipe* tolling does not apply to later class actions where a substantially identical class suit was denied certification due to a Rule 23 defect in the class itself"); *Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334, 1349-51 (5th Cir. 1985) (concluding that there is "no authority for [the] contention that putative class members may piggyback one class action onto another and thus toll the statute of limitations indefinitely"); *Andrews v. Orr*, 851 F.2d 146, 149 (6th Cir. 1988) ("The courts of appeals that have dealt with the issue appear to be in unanimous agreement that the pendency of a previously filed class action does not toll the limitations period for additional class actions by putative members of the original

(continued . . .)

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    And for good reason. Tolling would "allow lawyers to file successive putative class actions with the

2    hope of attracting more potential plaintiffs and perpetually tolling the statute of limitations as to all

3    such potential litigants, regardless of how many times a court declines to certify the class." *Basch v.*

4    *Ground Round, Inc.*, 139 F.3d 6, 11 (1st Cir. 1998); *see also* 5 *Moore's Federal Practice*,

5    §23.65[1][c] (3d ed. 2008) ("tolling would allow the question of certification to be relitigated over

6    and over, regardless of statute of limitations").

7         In the *Siemers* Action, lead plaintiff sought to certify a class consisting of all persons or

8    entities that invested during the five-year class period in any of the approximately 100 Wells Fargo

9    mutual funds. *See* RJN Ex. HH at 1:6-10. This Court declined to certify such a broad class,

10   concluding that the class would be unmanageable. *Id.*, Ex. GG at 1:20-23, 10:18-11:10. Plaintiffs

11   now seek to relitigate that issue and certify a class consisting of all persons or entities that invested

12   during the class period in any of the approximately 100 Wells Fargo mutual funds other than the

13   three at issue in the *Siemers* Action. FAC ¶1. Plaintiffs expressly state that "[t]his case is intended

14   to provide relief for all Wells Fargo mutual fund investors not covered by the class certification

15   order and subsequent settlement in *Siemers*." *Id.* ¶2.

16        This follow-on class action is therefore precisely the sort to which the tolling doctrine is

17   inapplicable. In *Korwek v. Hunt*, 827 F.2d 874 (2d Cir. 1987), the district court "certified a

18   narrower class that would be coextensive with [the] class representative['s] . . . trading activity . . . ."

19   *Id.* at 875. Disregarding the Court's finding that "the original action was unwieldy," plaintiffs

20   thereafter filed "what was essentially a duplicate of the original complaint" (*id.* at 879), in which

21   they sought to certify a class nearly the same in scope as the class originally sought. *Id.* at 876.

22   Holding that the statute of limitations had not been tolled by the original class action, the district

23   court granted defendants' motion to dismiss the class claims in the follow-on class action. *Id.* The

24   Second Circuit affirmed. *Id.*

25

26   _____

( . . . continued)

27   asserted class."); *Griffin v. Singletary*, 17 F.3d 356, 359 (11th Cir. 1994) (same); *see also Basch v.*
     *Ground Round, Inc.*, 139 F.3d 6, 11 (1st Cir. 1998) ("Plaintiffs may not stack one class action on top
28   of another and continue to toll the statute of limitations indefinitely").

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

DEFENDANTS' MOTION TO DISMISS                           08-CV-1830 WHA

1    This case is the same as that in *Korwek*, with which the Ninth Circuit and other circuits have

2    signaled their agreement. *Robbin*, 835 F.2d at 214 (citing *Korwek* with approval); *Yang*, 392 F.3d at

3    105 ("The Second Circuit rightly declined to toll the statutory period").  Plaintiffs here had ample

4    opportunity to bring a timely action before and after this Court's class certification ruling.  Having

5    failed to do so, the two-year statute has run.

6    **II.    IN ANY EVENT, THE STATUTE OF REPOSE BARS CLAIMS BASED ON
        ALLEGED MISREPRESENTATIONS OR OMISSIONS MADE MORE THAN FIVE**
7    **YEARS BEFORE THE ACTION WAS FILED.**

8    The putative class period alleged in the Complaint begins on November 4, 2000.  FAC ¶1.

9    Even in the absence of inquiry notice, 10b-5 claims must be brought within five years of the alleged

10   violation.  *See Betz*, 519 F.3d at 874-76; 28 U.S.C. §1658(b)(2).  This five-year provision is a statute

11   of repose, rather than a statute of limitations, and is not subject to equitable tolling.  *In re Zoran*

12   *Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1013-14 (N.D. Cal. 2007).

13   Even if the Court were not to apply the two-year statue of limitations and dismiss the action,

14   all claims based on any misrepresentations or omissions made five years before the action was

15   initiated on April 4, 2008 are untimely.  At a minimum, then, the putative class period must be

16   shortened accordingly, and may begin no earlier than April 4, 2003.

17   **III.   PLAINTIFFS FAIL TO PROPERLY ALLEGE THAT THE PURPORTED
        OMISSIONS AND MISREPRESENTATIONS WERE MATERIAL.**
18

19   To prevail on a 10b-5 claim, plaintiffs must show that the statements or omissions at issue

20   were misleading as to material facts.  *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).

21   Alternatively, a plaintiff may allege that a defendant was under a statutory or regulatory obligation

22   to disclose information allegedly omitted.  *In re Morgan Stanley & Van Kampen Mut. Fund Sec.*

23   *Litig.*, No. 03 Civ. 8208(RO), 2006 WL 1008138, at *7 (S.D.N.Y. April 18, 2006).  A statement is

24   material only if "there is a *substantial likelihood* that the disclosure of the omitted fact would have

25   been viewed by a reasonable investor as having *significantly altered* the total mix of information

26   made available." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 889 (9th Cir. 2008), *cert. denied*, 129 S.

27   Ct. 161 (Oct. 6, 2008).  This "fact-specific inquiry" (*id.*) must be pleaded with particularity under

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

the PSLRA and FRCP 9(b).  *In re AIG Advisor Group Sec. Litig.*, No. 06 CV 1625(JG), 2007 WL 2750676, at *2 (E.D.N.Y. Sept. 20, 2007).

Here, Plaintiffs fail to allege either (1) a statutory or regulatory obligation to disclose the details of revenue-sharing programs; or (2) the materiality of any misstatements or omissions with sufficient particularity as to any Plaintiff, any prospectus, or any purchase or sale of any Wells Fargo Fund.

The Complaint does not allege the existence of any laws or regulations requiring that a mutual fund prospectus disclose the details of a revenue-sharing program.  The Courts have recognized that such regulations do not exist.  *Hoffman v. UBS-AG*, —F. Supp. 2d—, No. 05 Civ 6817LBS, 2008 WL 4684168, at *6 (S.D.N.Y Oct. 22, 2008) ("[C]urrent Second Circuit law supports the conclusion that no SEC rule requires disclosure of specific shelf-space arrangements without further inquiry"); *Benzon v. Morgan Stanley Distrib., Inc.*, 420 F.3d 598, 612 (6th Cir. 2005) ("Current SEC regulations, including Form N1-A, do not impose a disclosure obligation with respect to broker compensation").  Accordingly, "materiality" cannot be established by law or regulations.

Plaintiffs' purely conclusory pleading of materiality fails to satisfy the particularity requirement of the PSLRA or FRCP 9(b).  Plaintiffs certify that they invested in over a dozen Wells Fargo funds.  Yet, they only allege that no reasonable investor would have invested in any of WFFM's funds had he or she known that WFFM paid "hundreds of millions of dollars" to selling agents in non-12b-1 fees.  FAC ¶157.  The basic facts required to support this conclusion are missing.  Plaintiffs *do not* allege *how much* in revenue-sharing (obtained by virtue of excessive fees) was paid by WFFM on behalf of *any* fund in *any* year.  There are no facts pleaded showing how any such amount related either to total fees paid by the fund to WFFM or to total assets of any fund, or how such payments affected any fund's performance.  Nor are there facts pleaded that would explain why a reasonable investor considering purchasing *any particular* Wells Fargo fund would find the portion of fully disclosed fees spent on revenue-sharing to be important.

Instead of specific Plaintiff-by-Plaintiff, year-by-year, and fund-by-fund materiality allegations, Plaintiffs' materiality theory seems to rest on the flawed assumption that the aggregate amount WFFM paid from fees received from all its funds to all its selling agents over a multi-year

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

period was a "large" sum.  But the fact that several hundred million dollars in the aggregate was paid over a long period of time is utterly immaterial where the fund assets during the same period was comprised of billions of dollars.  Numerous 10b-5 cases hold that subjectively large amounts are not material in relation to much, much larger sums.  The district court in *Johnson v. Tellabs*, 262 F. Supp. 2d 937, 949 n.12 (N.D. Ill. 2003), held that the plaintiffs' allegation that the defendant's purported channel stuffing resulted in returns of "millions of dollars" failed to satisfy the materiality requirement where the defendant's fourth-quarter sales alone were more than a billion dollars.  *See also In re Coca-Cola Enters. Sec. Litig.*, 510 F. Supp. 2d 1187, 1197 (N.D. Ga. 2007) (a "plaintiff must allege facts that show that the amount of sales or revenue improperly recognized is material in relation to the size of the company's operations"); *Hoffman*, 2008 WL 4684168, at *8 (allegation that defendant paid 100 basis points to financial advisors for revenue-sharing did not satisfy the materiality requirement).

Plaintiffs' approach to pleading materiality with respect to revenue-sharing arrangements has been rejected by other courts.  In September 2007, after the *Siemers* Action settled, the court in *In re AIG Advisor Group Securities Litigation*, 2007 WL 2750676, at *1, held that plaintiffs failed to plead a 10b-5 case based on revenue-sharing where the complaint did not allege the amount of assets under management for any fund or how much the brokers stood to receive as compensation for their shelf-space programs.  The court rejected plaintiffs' attempt to plead materiality by aggregating "figures covering thousands of transactions brokered by thousands of financial advisors in which the plaintiffs did not purchase interests."  *Id*. at *3.

Here, it is impossible to determine from the Complaint whether the amount of fees paid by any fund to WFFM was excessive by a material amount or whether money paid by WFFM to brokers in *any year* as to *any fund* were material.  The Complaint fails to plead specific facts as to these amounts and how they relate to the funds' assets, total fees, and its performance.  Because of the extensive discovery in the *Siemers* Action, Plaintiffs' failure to plead these facts with specificity cannot be excused by lack of access to WFFM documents.  Accordingly, Plaintiffs' 10b-5 claim should be dismissed for having insufficiently pleaded materiality.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

## IV. PLAINTIFFS FAIL TO ALLEGE THAT THEY RELIED ON DEFENDANTS' PROSPECTUSES AND SAIS.

Reliance is an express element of every 10b-5 claim and "requires plaintiffs to prove that the alleged misrepresentations induced them to do something different from what they would otherwise have done in making investment decisions." *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 321 (8th Cir. 1998). Plaintiffs must plead reliance with specificity. *Id. at* 321; *In re Pfizer Inc. Sec. Litig.*, —F. Supp 2d—, No. 04 Civ. 9866(LTS) (DCF), 2008 WL 2627131, at *18 (S.D.N.Y. July 1, 2008) (dismissing claims based only on "general allegations of direct reliance").

Pleading individual reliance may be excused in two limited circumstances. First, the fraud-on-the-market theory can presume reliance. *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988). Second, the *Ute* exception allows a presumption of reliance where the defendant allegedly *omitted material information* from its communications with a plaintiff. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972). As demonstrated below, (1) Plaintiffs fail to adequately plead individual reliance; and (2) neither the fraud-on-the-market nor the *Ute* exception is applicable.

### A. Plaintiffs Have Not Pleaded That They Read The Prospectuses Or SAIs At Issue.

Beyond a purely conclusory allegation that they "rel[ied] directly" on the purportedly misleading *information* in the Prospectuses and SAIs (FAC ¶¶245, 262), none of the six named Plaintiffs allege how, when, or where they received *any* or all of the Wells Fargo prospectuses at issue, which parts of them they read and relied upon, or how any disclosures or omissions related to their purchase decisions. These are fundamental facts that must be pleaded with specificity to properly allege individual reliance. The Complaint also does not allege that any of the Plaintiffs ever read or requested any of the purportedly misleading SAIs. The conclusory statement that plaintiffs "directly relied" on misleading information in the prospectuses and SAIs is insufficient:

> The Plaintiffs did not adequately plead actual reliance, because they did not allege specific facts showing that they relied on the Prospectus or any post-offering statements by the defendants. They did not claim that they ever read the Prospectus or specify which allegedly fraudulent statements they relied on in purchasing NationsMart stock. (*NationsMart*, 130 F.3d. at 322)

*Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2006 WL 2355411, at *4 (N.D. Cal. Aug. 14,

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

2006) ("[T]he court is not required to 'accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged'") (quoting *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994)).

Unless there is a ground upon which to excuse Plaintiffs' failure to specifically plead individual reliance, the Complaint must be dismissed.  The next two sections show that no such ground exists.

### B.     The Fraud-On-The-Market Exception Is Not Applicable.

Where plaintiffs show that the defendant perpetrated a fraud on the *stock exchange market*, the reliance element is presumed satisfied.  *Blackie v. Barrack*, 524 F.2d 891, 906 (9th Cir. 1975).  Plaintiffs do not plead "fraud on the market" and, as this Court found in *Siemers*, the fraud-on-the-market exception is inapplicable with respect to a mutual fund case.  RJN Ex. GG at 6; *accord*, *In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1188 (N.D. Cal. 2004).

### C.     The *Ute* Exception Does Not Apply.

*Ute* permits a presumption of reliance if the alleged omissions are material.  *Ute*, 406 U.S. at 153-54.  However, omissions are actionable only where the material omitted is required by law to be disclosed or where the omissions caused statements made to a plaintiff to be misleading.  *Ulferts v. Franklin Res. Inc.*, 567 F. Supp. 2d 678, 680 (D.N.J. 2008).  Neither is properly alleged here, making the *Ute* exception inapplicable.

Unlike this case, *Ute* involved misleading statements directly made to plaintiffs.  A federal trusteeship over an Indian tribe had been terminated and its assets were to be distributed to its "mixed blood" members.  406 U.S. at 135-36.  The defendant bankers were charged by the corporation representing the mixed-blood members to purchase shares from any members who chose to sell them early.  *Id.*  But the corporation instructed the defendant bankers to inform the would-be sellers that there was no way to determine the true value of the stock at the time of sale.  *Id.* at 145-46.  Contrary to these instructions, the defendant bankers facilitated a thriving non-Indian market for the stock by purchasing it for themselves and arranging standing orders for their purchase for profits as large as twice the value of each share.  *Id.* at 147.  Because their profit-making scheme would have been material if known to plaintiffs, the Supreme Court held that the bankers had an

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    affirmative duty to disclose these facts. *Id*. at 153.

2          *Ute* is founded upon communicative interaction between the defendant and plaintiff, whether

3    verbal or in writing, in which a misleading statement was made. The *Ute* presumption is based on a

4    policy of avoiding forcing a plaintiff to show "a speculative state of facts, *i.e.*, how he would have

5    acted if omitted material information had been disclosed." *Basic*, 485 U.S. at 245. But no such

6    concern arises until a plaintiff alleges that he has received misleading information in the first place.

7          The need for this threshold interaction has been recognized by subsequent cases. In *Eckstein*

8    *v. Balcor Film Investors*, 58 F.3d 1162, 1170-71 (7th Cir. 1995), investors defined as those *not*

9    *having relied on* the defendant's public offering materials argued that they nevertheless would not

10   have purchased the securities had they known about the material information allegedly omitted from

11   those materials. After holding that the fraud-on-the-market exception was inapplicable, the Seventh

12   Circuit affirmed summary judgment against plaintiffs on the ground that the *Ute* presumption does

13   not apply where there was no opportunity for the plaintiffs to have been deceived: "People who did

14   not rely on what was *in* the materials cannot have relied on what was omitted; to them the public

15   offering materials were so much waste paper." *Id*. at 1171. In *Shores v. Sklar*, 647 F.2d 462, 468

16   (5th Cir. 1981), the Fifth Circuit held that *Ute* was inapplicable where the plaintiff never read or

17   otherwise relied on the document he alleged contained material omissions.

18         Here, Plaintiffs do not allege any facts showing that there was any opportunity for them to be

19   mislead by any omissions from the prospectuses and SAIs because they do not specifically allege

20   that they received or read the prospectuses or SAIs. This illustrates the logical flaw here: How can

21   omissions be subject to reliance by a plaintiff who never read the representations alleged to be

22   misleading *as a result* of those omissions? Accordingly, the *Ute* exception does not apply.

23   **V.    PLAINTIFFS FAIL TO PROPERLY ALLEGE THAT DEFENDANTS ACTED WITH**
24   **       THE REQUISITE SCIENTER.**

25         To prevail on a 10b-5 claim, "a private plaintiff must prove that the defendant acted with

26   scienter, a mental state embracing an intent to deceive, manipulate, or defraud." *Tellabs, Inc. v.*

27   *Makor Issues & Rights, Ltd*., 127 S. Ct. 2499, 2507 (2007) (quotation marks and citation omitted).

28   It must allege and then prove that "the defendant made false or misleading statements either

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, —F.3d—,

2   No. 06-35758, 2009 WL 57081, at *6 (9th Cir. Jan. 12, 2009) (quotation marks and citation

3   omitted):

4       [T]he plaintiff must plead a *highly unreasonable omission*, involving not merely simple,
        or *even inexcusable negligence*, but an *extreme departure from the standards of*
5       *ordinary care*, and which presents of a danger of misleading buyers or sellers that is
        either known to the defendant or is so obvious that the actor must have been aware of it.
6       (*Id.* (emphasis added) (citation omitted))

7       The PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong

8   inference that the defendant acted with [scienter]."   15 U.S.C. §78u-4(b)(2).   In June 2007, the

9   Supreme Court in *Tellabs* held that the "strong inference" requirement demands more than "facts

10  from which an inference of scienter *could* be drawn."  *Tellabs*, 127 S. Ct. at 2510.  The plaintiff

11  "must plead facts rendering an inference *at least as likely as* any plausible opposing inference."  *Id.*

12  at 2513.  The inference of scienter "must be *more* than merely 'reasonable' or 'permissible'—it must

13  be cogent and compelling, thus strong in light of other explanations."  *Id.* at 2510 (emphasis added).

14  In determining whether such an inference arises, *Tellabs* instructs courts to consider the complaint

15  holistically.  *Id.* at 2509.

16      *Tellabs*'s high threshold for pleading scienter has been stringently enforced by the Ninth

17  Circuit, which has repeatedly upheld dismissals where the *Tellabs* standard is not satisfied.  *Rubke v.*

18  *Capitol Bancorp Ltd.*, —F.3d—, No 07-15083, 2009 WL 69278, at *9 (9th Cir. Jan. 13, 2009);

19  *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 745-49 (9th Cir. 2008); *Metzler Inv. GMBH v.*

20  *Corinthian Colleges, Inc.*, 540 F.3d 1049, 1069 (9th Cir. 2008); *Zucco*, 2009 WL 57081, at *1.

21      Plaintiffs' allegations of scienter are not detailed and specific and fail to give rise to a strong

22  inference of scienter.  They are improperly conclusory.  First, Plaintiffs' allege that the Defendants

23  knew of the revenue-sharing arrangements and issued the allegedly misleading prospectuses and

24  SAIs.   FAC ¶¶143, 145, 164-69.   But the issuance of alleged misrepresentations is by itself

25  insufficient to show scienter.  *Zucco*, 2009 WL 57081, at *6.

26      Second, Plaintiffs allege that WFFM was motivated to limit its revenue-sharing disclosures so

27  that it could induce customers to invest in the funds.  FAC ¶¶5, 239.  This generalized motive has

28  repeatedly been rejected as insufficient.  *In re Morgan Stanley & Van Kampen Mut. Fund Sec.*

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   *Litig.*, 2006 WL 1008138, at \*10 (S.D.N.Y. Apr. 18, 2006) (a mutual fund's desire to attract more

2   investors as a way of increasing fees is too generalized a motive to constitute scienter); *Castillo v.*

3   *Dean Witter Discover & Co.*, No. 97 Civ. 1272(RPP), 1998 WL 342050, at \*10 (S.D.N.Y. June 25,

4   1998) (same).

5         The Complaint concedes that WFFM *repeatedly disclosed* the existence of its revenue-sharing

6   arrangements.  Plaintiffs allege that the February 1, 2002 Stock Funds prospectus states that "selling

7   or shareholder servicing agents may receive significant additional payments directly from the

8   Adviser . . . in connection with the sale of Fund shares."   FAC ¶42.   Plaintiffs' allegations of

9   WFFM's subsequent disclosures shows that it *increased* disclosure in later years.  *Id.* ¶¶46, 49.

10  Having conceded that revenue-sharing was disclosed, Plaintiffs attempt to allege scienter by

11  criticizing the manner of such disclosures:  that they were not repeated elsewhere in the prospectuses

12  (*id. e.g.*, ¶¶34, 38); that they did not provide more specific information about the revenue-sharing

13  arrangements, (*id. e.g.*, ¶42); and that the disclosures stated that revenue-sharing "may" occur when

14  the arrangements were already in place.  *Id.*

15        This does not come close to alleging "a highly unreasonable omission" or "extreme departure

16  from the standards of ordinary care."  *Zucco*, 2009 WL 57081, at \*6 (quotation marks and citation

17  omitted).  This is especially true given that there is no allegation that revenue-sharing changed the

18  amount of fees paid by any fund to WFFM, changed the amount of fees charged to any investor,

19  altered the strategy of any fund, or altered the reporting of their past performance.  To the extent

20  investors might be concerned about how much of the fees were passed along to retail brokers, if any,

21  WFFM's disclosure was more than adequate to put them on notice and enable such investors to

22  make further inquiries to their broker.  *See Hoffman v. UBS-AG*, —F. Supp. 2d—, No. 05CIV6817

23  LBS, 2008 WL 4684168, at \*6 (S.D.N.Y. Oct. 22, 2008) (disclosure that an advisor *may* enter into a

24  shelf-space fund agreement "gave investors adequate notice of the possibility of shelf-space

25  agreements, arrangements about which investors could have inquired"); *Ulferts v. Franklin Res.,*

26  *Inc.*, 567 F. Supp. 2d 678, 682 (D.N.J. 2008) (there was "nothing misleading" with respect to a

27  mutual fund prospectus that made investors aware that revenue-sharing agreements *might* exist).

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

DEFENDANTS' MOTION TO DISMISS                    08-CV-1830 WHA

A.    **The Inference That Defendants Acted Without An Intention To Deceive Or Defraud Investors Is More Compelling Than An Inference Of Scienter.**

*Tellabs* requires a second level of analysis, which further demonstrates the absence of properly pleaded allegations showing a "strong inference" of scienter.  Here, the Complaint, case law, and secondary sources show that Plaintiffs' attempt to infer scienter is weak when compared with the competing inference that Defendants acted consistently with regulatory guidance and in accord with industry custom and practice.

1.    **Despite The Widespread Practice Of Revenue-Sharing, The SEC Never Established An Obligation To Disclose Its Existence.**

Revenue-sharing programs have been in place since the 1990s.[4]  Throughout the class period, the practice of revenue-sharing between brokers and mutual fund managers was widespread.[5]  Both the SEC and Congress have been aware of the existence of revenue-sharing programs for years.[6]  Despite this knowledge, neither Congress nor the SEC ever prohibited revenue-sharing.  Nor did they establish any rules or regulations obligating mutual funds to disclose its existence in prospectuses or SAIs.

In 2000, the SEC stated in an amicus brief to the Second Circuit that a fund's minimal disclosure of revenue-sharing was sufficient to put investors on notice of potential conflicts of interests with their broker.  SEC Amicus Brief, *Cohen v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 2000 WL 34447852, at *27-28 (2d Cir., filed Feb. 14, 2000).  The SEC said that "disclosure with precision is not necessary" and concluded that the prospectus's language adequately discloses the mere "existence of a conflict and gives some idea of the dimensions of the conflict."  *Id.* at **21, 28.

---

[4]RJN Ex. II.

[5]*See, e.g.*, *Id.*, Ex. JJ (noting that revenue-sharing was a "widespread industry practice"); *Id.*, Ex. KK ("Revenue-sharing has been a practice that has been well known in the industry and has been going on in its present form and its present intensity for many, many years").

[6]*See, e.g.*, *id.*, Ex. LL (noting, in its report to Congress, that "80% of fund companies that partner with major broker-dealers make revenue sharing payments"); SEC, *Proposed Rules*, 69 F.R. 9726 (Mar. 1, 2004) ("Our staff found that the use of brokerage commissions to facilitate the sale of fund shares is widespread among funds that rely on brokers to sell their shares"); RJN Ex. KK (discussing the SEC's long-held practice of condoning minimal disclosure of revenue-sharing arrangements between mutual funds and brokers).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

Relying on the SEC's position and the disclosures in prospectuses, the Second Circuit found that additional information regarding the revenue-sharing at the retail level would not be material to an investor with respect to potential conflicts of interest with brokers under Rule 10b-5.  In *Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 131 (2nd Cir. 2000), it stated that:

> because the SEC has decided precisely what type of disclosure is necessary to reveal a conflict of interest arising from third-party payments to brokers in the context of Rule 10b-10, we will not undermine the SEC's interpretation by requiring even greater disclosure about that conflict of interest under the general antifraud provisions of Rule 10b-5.

The Second Circuit's opinion gave the entire industry substantial comfort that "notice" disclosure of revenue-sharing in a fund prospectus would be sufficient both at the distribution and retail levels. Because WFFM had no reason to believe that its disclosures were improper, it is not possible to infer scienter.  *In re Morgan Stanley*, 2006 WL 1008138, at *11 ("It cannot be conscious misbehavior or recklessness for a defendant to fail to disclose in a prospectus information that is neither material nor required to be disclosed under applicable SEC regulations" (quotation marks and citation omitted)).

Industry-wide practices provide important context in determining whether the defendant has the requisite scienter in a 10b-5 case.  *Berckeley Investments Group, Ltd. v. Colkitt*, 455 F.3d 195, 218-219 (3rd Cir. 2006).  Following the *Press* decision, the prospectuses of many mutual funds provided a similar level of disclosure to that of WFFM, and were found adequate upon judicial review.  In *Ulferts*, the prospectus stated that "Distributors and/or affiliates *may* provide financial support to securities dealers that sell share[s] of Franklin Templeton Investments. . . . Financial support to securities dealers may be made by payments from Distributor's own resources . . . ."  567 F. Supp. 2d at 682 (emphasis added).  In *Hoffman*, 2008 WL 4684168, at *6, defendants' prospectuses "disclosed that they *might* enter into agreements akin to shelf-space agreements."  In both cases, challenges to the adequacy of disclosure were rejected.  Reliable secondary sources also suggest that disclosure by the mutual fund industry of revenue-sharing arrangements was general and succinct.[7]

---

[7]*See, e.g.*, RJN Ex. LL ("[T]he amount of revenue sharing payments . . . are not typically
(continued . . . )

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

### 2.   The Complaint's Allegations Show No Intent To Deceive.

Despite Plaintiffs' central theme that Defendants intended to conceal their revenue-sharing arrangements, the Complaint pleads numerous contradictory facts, including internal and external communications, the existence of written third-party revenue-sharing agreements, and the fact that WFFM's prospectuses and SAIs *disclosed* the existence of its revenue-sharing programs beginning in 2002 and increased such disclosure throughout the class period.  While Plaintiffs or this Court may disagree with the form, content or location of such disclosures, such disagreement does not mean that WFFM committed securities fraud when it made the disclosures.  There is a significant difference between pleading that a disclosure is inadequate and meeting the much higher hurdle of pleading with specificity that it was drafted and published with scienter.

Plaintiffs' allegations of correspondence between Defendants and brokers and internal communications among WFFM officers further negates an inference of scienter.  *Id*. ¶¶136, 140, 141, 143, 148-53.  None of these excerpts show that the WFFM-affiliated speakers believed that WFFM's revenue-sharing arrangements were improper or that WFFM's disclosures were inadequate.  Rather, the candor of the WFFM officers regarding the revenue-sharing programs strongly indicates that they (rightfully) believed that WFFM was acting within the law.  A particularly striking example is where the Complaint notes that *a particular broker* was reluctant to put its revenue-sharing agreement with WFFM into writing (*id*. ¶140), but that WFFM "was fairly insistent upon document[ing] the fee payments" with that broker-dealer, and, indeed, a written agreement resulted.  *Id*. ¶¶139, 140.  All of the written materials cited in the complaint were found within WFFM's files and were accessible both to Plaintiffs in discovery and to routine and special audits by regulators.  That is not consistent with scienter.

---

( . . . continued)
disclosed to investors, except for possible general disclosure in a fund's prospectus or SAI"); *id*., Ex. KK (noting that revenue-sharing arrangements were "disclosed to investors in only vague terms, or, in some cases, not disclosed at all"); *id*., Ex. II at 56 ("To the extent that funds do disclose payments [to broker-dealers], they keep the details to a minimum").

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

For all of these reasons, the inference of scienter that Plaintiffs attempt to plead is not "strong" and is far inferior to the more reasonable inference that WFFM believed that its disclosures were in accord with the law, regulatory guidance, and industry practice.

## VI. PLAINTIFFS FAIL TO ALLEGE WITH PARTICULARITY THAT THE FEES WERE EXCESSIVE UNDER *GARTENBERG*.

Under the unique theory of *Siemers*, the obligation of a mutual fund to make detailed disclosure of revenue-sharing arises when the advisor's ability to share revenue is a direct result of its extraction of excessive fees. If such non-disclosure is actionable under Rule 10b-5, then the pleading of the facts underlying excessiveness must be made with the specificity required by the PSLRA. These allegations should specify the amount of excessiveness for each fund; the amount used in revenue-sharing by each fund; the effect on the performance of each fund; the damages caused investors for each year of the class period; and the facts that caused the fund to pay excessive fees. None of these facts are in the Complaint.

Although Plaintiffs attempt to allege that the fees charged by Wells Fargo were "excessive," (*see* FAC ¶¶183-84), using the factors set out in *Gartenberg v. Merrill Lynch Asset Management*, 694 F.2d 923, 929-30 (2d Cir. 1982), their allegations are utterly inadequate. In fact, Plaintiffs do not come close to properly pleading *any* of the *Gartenberg* factors:  [8]

*Conscientiousness and Independence of Directors.* Recognizing that the conscientiousness and independence of directors is "among the most important factors to be examined in evaluating whether the compensation fund advisers and distributors receive is reasonable" (FAC ¶228 (citing

---

[8]The theory that Wells Fargo charged excessive fees in multiple funds for a five-year period is implausible from an economic point of view. As stated in a recent study, advisors "compete for individual investors' assets by striving for superior returns—net of fees—in order to increase money inflows . . . . Because of this competition, any attempt by an advisor to charge excessive fees relative to the services offered will fail in the long run as investors move to lower-cost, higher-service or -return investments. As long as investors can switch at relatively low cost, excessive fees cannot persist for more than a short period of time . . . ." J. Coates & R. Hubbard, *Competition In The Mutual Fund Industry: Evidence And Implications For Policy*, 33 J. Corp. L. 151, 159 (2007). *See also Jones v. Harris Associates, LP*, 527 F.3d 627, 634 (7th Cir. 2008) (disapproving *Gartenberg's* focus on the amount of fees because the market is a better price-setter than the judiciary; noting that "investors can and do and 'fire' advisers cheaply and easily by moving their money elsewhere").

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

*Gartenberg*)), Plaintiffs state the "Directors were beholden to the" advisors, "failed to adequately inform themselves[,] and disregarded 'red flags.'"  FAC ¶177; *see id*. ¶175.  But they allege no specific facts about how the directors were "interested" or "beholden," failing in any manner to demonstrate why any of the Directors would constitute an "interested person" as that term is defined with specificity in the Investment Company Act of 1940.  15 U.S.C. §80(a)-2(a)(9).  Nor do they allege any specific, credible facts that demonstrate a failure by the directors to meet their duty of care or any other facts that would create a reasonable doubt that the board is entitled to the benefit of the business judgment rule.  *Grimes v. Donald*, 673 A.2d 1207, 1219 (Del. 1996), *overruled on other grounds*, 746 A2d 244 (Del. 2000).[9]

*Nature and Quality of Services/Fund Performance.*  The Complaint contains virtually no allegations about the nature and quality of services, much less the nature and quality of services for the funds in which Plaintiffs actually invested.  FAC ¶¶202-06.  Plaintiffs instead rely on allegations that the returns on some of the Wells Fargo funds were consistent with those of the S&P 500 Market Index.  *Id*. ¶206.  Similar allegations have been held insufficient.  *See*, *e.g.*, *Amron v. Morgan Stanley Inv. Advisors Inc*., 464 F.3d 338, 344 (2d Cir. 2006); *Hoffman*, 2008 WL 4684168, at *10; *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 528 F. Supp. 2d 332, 337-338 (S.D.N.Y. 2007).

*"Fall-Out" Benefits; Profitability of Fund.*  Plaintiffs make no allegations whether any fall-out benefits accrued to Defendants.  Nor do they allege with particularity the profitability of the funds to the advisor, instead making the bare allegation that the advisor "received 'something for nothing'" (FAC ¶221) and that Defendants got a "windfall" as a consequence of economies of scale (*see, e.g.*, *id.* ¶187).  But such conclusory statements are meaningless without any allegations about the *cost* of running the funds.  *In re Salomon Smith Barney*, 528 F. Supp. 2d at 338.

---

[9]The closest Plaintiffs get is the conclusory allegation that the directors improperly considered the Wells Fargo funds as a family unit instead of individually, pointing to certain agreements that were entered into for all the funds.  FAC ¶¶232-233.  Just three paragraphs later, however, Plaintiffs fault the directors for treating the funds *differently* by adopting breakpoints for certain funds, but not others.  *Id.* ¶236.  This point does not come close to establishing the breach of fiduciary duty which is at the heart of this claim.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

*Economies of Scale.*  Plaintiffs allege that, because the expense ratio of certain funds—only one of which Plaintiffs invested in—remained the same or increased while the NAV increased, economies of scale were not passed on to investors.  FAC ¶¶185-93.  Such allegations, when there are no corresponding allegations about the transaction costs for the funds, are insufficient to plead this factor.  *Amron*, 464 F.3d at 345; *Hoffman*, 2008 WL 4684168, at *11; *In re Salomon Smith Barney*, 528 F. Supp. 2d at 339.  Nor can this factor be salvaged by Plaintiffs' allegations about certain funds' breakpoints.  FAC ¶¶195-201.  What Plaintiffs allege to be high breakpoints (*id.* ¶195) does not establish a failure to pass along the economies of scale, but merely the compensation structure of the funds.  *Hoffman*, 2008 WL 4684168, at *11.  The differences in the breakpoints between the advisor and subadvisor also do not support this factor (*id.* ¶¶195-99), as they can explained by the different services provided by the two.  *Hoffman*, 2008 WL 4684168, at *11.

*Comparative Fee Structures.*  Plaintiffs make no allegations about how the fees of any of the funds in which Plaintiffs invested in compare with similar funds.  FAC ¶¶207-13.

## VII. PLAINTIFFS FAIL TO ALLEGE ANY LOSSES OR DAMAGES THAT ARE RECOVERABLE UNDER RULE 10B-5.

Courts have limited the nature of damages recoverable under Rule 10b-5 to cognizable economic losses that are attributable to the fraud of the defendant.  Both "economic loss" and "loss causation" must be alleged with specificity.  *See Dura Pharm. v. Broudo*, 544 U.S. 336, 341, 342 (2005).  *Accord*, *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1056 (9th Cir. 2008).

Loss causation allegations are adequate only if the plaintiff alleges that the defendant's fraud inflated the price of the securities and that the disclosure of the fraud caused the value of those securities to drop, thereby damaging the plaintiff.  *Dura*, 544 U.S. at 346-48.  *See also Metzler Inc. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) (a complaint under 10b-5 must allege that the share price fell significantly after the truth became known); *In re Daou Sys.*, 411 F.3d 1006, 1026 (9th Cir. 2005) (a plaintiff must plead that the drop in the stock price was causally related to the defendant's misstatements).  If the fraud's disclosure does nothing to the price of the security, then the fraud is not actionable under Rule 10b-5.  *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261, 271 (5th Cir. 2007).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1      Plaintiffs allege, with no degree of specificity, that Defendants "artificially inflated" and

2   "distorted" the prices of Wells Fargo mutual fund shares.  FAC ¶¶244-45.  Not only is this allegation

3   factually incorrect—defendants' revenue-sharing arrangement had *no* effect on the mutual funds'

4   share prices, which are determined exclusively from the price of the underlying securities—but it is

5   exactly the type of pleading that the *Dura* court rejected.  544 U.S. at 346-48.

6      **A.   "Excessive Fees" Are Not Recoverable Under Rule 10b-5.**

7      Rule 10b-5 is targeted at preventing fraud connected to the "purchase or sale of securities."

8   *Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971) ("Congress

9   meant to bar deceptive devices and contrivances *in the purchase or sale of securities* whether

10  conducted in the organized markets or face to face" (emphasis added)).  Excessive mutual fund fees

11  of the sort alleged here are not incurred in the course of buying and selling securities.  The fees are,

12  at most, no more than an indirect cost of *holding* shares of a mutual fund.  Long-term holders of

13  mutual funds theoretically incur more harm from excessive fees than do short-term traders of mutual

14  fund shares.  That is because the fees paid by a fund to its advisor are not part of the purchase or sale

15  transaction.  The Investment Company Act of 1940, and specifically Section 36(b) thereof, provide

16  an express remedy for excessive fees charged to holders of mutual funds.  We are aware of no

17  appellate decision that has extended the reach of the implied cause of action under Section 10 of the

18  1934 Act to allow damages to mutual fund investors in the amount of excessive fees paid by a fund

19  to its advisor.

20     **B.   Brokerage Churning Cases Are Inapposite.**

21     This Court in *Siemers* suggested that because some courts allowed Section 10 claims

22  involving brokerage churning, plaintiffs alleging excessive mutual fund fees might establish loss

23  causation.  RJN Ex. GG at 8.  We believe that the churning analogy is inapposite and that the Court

24  should reexamine it.

25     A churning case involves a retail broker making needless transactions with a client's money in

26  order to generate fees.  The investor must prove not only that the broker intended to defraud his

27  client, but also that the broker had control over the improper transactions.  *Mihara v. Dean Witter*

28  *Co.*, 619 F.2d 814, 821 (9th Cir. 1980); *see also Follansbee v. Davis, Skaggs & Co., Inc.*, 681 F.2d

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

673, 677-78 (1982) (no churning claim where plaintiff approved of the allegedly wrongful transactions). In churning cases, the broker's actions can be said to have directly caused the investor to lose money in the form of excessive commissions charged to *his account*.

But churning cases fail to establish a sound basis for recognizing the amount of excessive fees paid by a mutual fund to its advisor as 10b-5 damages. The broker churning claim pre-dates the Reform Act and PSLRA and the strict requirement that loss causation be pleaded with particularity. It does not require misrepresentations or omissions or loss causation. *Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d 525, 530 (9th Cir. 1986). In a series of cases in the 1980s and early 1990s—before the passage of the Reform Act and PSLRA—the Ninth Circuit recognized that loss causation would be difficult or impossible to establish in a churning case, and therefore *need not even be proven*. *Nesbit v. McNeil*, 896 F.2d 380, 386 (9th Cir. 1990); *Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767, 773 (9th Cir. 1984) (same). In so doing, the Court *distinguished* cases involving misrepresentations and omissions from churning cases. As it recognized in *Hatrock*, it is precisely because a churning claim does *not* involve false statements or omissions that loss causation need not be proven:

> It is true that in an action brought under Rule 10b-5 for material omissions or misstatements, the plaintiff must prove both transaction causation, that the violations in question caused the plaintiff to engage in the transaction, and loss causation, that the misrepresentations or omissions caused the harm. The plaintiff, however, should not have to prove loss causation where the evil is not the price the investor paid for a security, but the broker's fraudulent inducement of the investor to purchase the security. Therefore, when a securities broker engages in excessive trading in disregard of his customer's investment objectives for the purpose of generating commission business, the customer may hold the broker liable for churning without proving loss causation. (750 F.2d at 773 (citations omitted))

Broker churning cases, therefore, do not excuse specific pleading of loss causation where a plaintiff's 10b-5 claims are based on misrepresentations or omissions.

### C.   Plaintiffs Fail To Plead Their Losses With Specificity.

The Ninth Circuit requires plaintiffs to allege facts in sufficient detail to demonstrate how defendants' alleged acts caused a specific economic loss. *Metzler*, 540 F.3d at 1064. Here, the Complaint is so vague that is impossible to understand how and from where any particular damages arose. In the three paragraphs (of their 270-paragraph complaint) that Plaintiffs devote to loss

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

causation, Plaintiffs fail to identify the source of any damages or the amount of damages allegedly suffered by any Plaintiff or in any mutual fund.  Plaintiffs fail to say by what amount the fees were excessive for any single Wells Fargo fund in which they invested (or for each of the funds they try to encompass within the putative class).  Plaintiffs also fail to allege with particularity how any alleged excess in fees paid by each fund to the advisor affected the value of their shares or the performance of the fund.  Because of this clear absence of specificity, the Complaint fails.

## CONCLUSION

For each of these separate and independent grounds, the Complaint should be dismissed with prejudice.

DATED:  January 22, 2009.                    Respectfully,

GILBERT R. SEROTA
JIN H. KIM
JEREMY T. KAMRAS

HOWARD RICE NEMEROVSKI CANADY
        FALK & RABKIN
A Professional Corporation


By:  _____/s/ Gilbert R. Serota_____
                GILBERT R. SEROTA

Attorneys for Defendants WELLS FARGO &
COMPANY, WELLS FARGO FUNDS
MANAGEMENT, LLC, AND WELLS FARGO
FUNDS TRUST

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

DEFENDANTS' MOTION TO DISMISS                    08-CV-1830 WHA
-25-