1
2
3
4
5
6
7
8
9
10
11

**REESE RICHMAN LLP**
Michael R. Reese (Cal. State Bar. No. 206773)
875 Avenue of the Americas, 18th Floor
New York, New York 10001
Telephone:  (212) 579-4625
Facsimile:  (212) 5673-4272
michael@reeserichman.com

– and –

**WHATLEY DRAKE & KALLAS, LLC**
Deborah Clark-Weintraub (admitted *pro hac vice*)
Elizabeth Rosenberg (admitted *pro hac vice*)
1540 Broadway, 37th Floor
New York, New York 10036
Telephone:  (212) 447-7070
Facsimile:  (212) 447-7077
dweintraub@wdklaw.com
erosenberg@wdklaw.com

*Counsel for Plaintiffs*

**Portions Redacted**
**Pursuant to**
**Protective Order**

|  |  |
|---|---|
| 12<br>13<br>14<br>15<br>16<br>17<br>18<br>19 | EDWARD LEE, EDWARD ARSENAULT, EMIL DE BACCO, RICHARD HINTON, ARNOLD KREEK, and MARGARET MACHT, Individually And On Behalf Of All Others Similarly Situated,<br><br>                      Plaintiffs,<br><br>      vs.<br><br>WELLS FARGO & COMPANY, WELLS FARGO FUNDS MANAGEMENT, LLC, and WELLS FARGO FUNDS TRUST.<br><br>                      Defendants. | Case No. CV 08-1830 WHA<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date:      February 26, 2009<br>Time:      2:00 P.M.<br>Dept.:     Courtroom 9, 19th Floor<br><br>Action Filed:  April 4, 2008<br>Trial Date:    None Set |

20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.  STANDARD OF REVIEW ......................................................................... 2

II.  THIS ACTION IS TIMELY ........................................................................ 2

   1.  A Determination of Inquiry Notice is Inappropriate on a Motion to
       Dismiss ......................................................................................................... 2

   2.  Inquiry Notice Does not Trigger the Running of the Statute of
       Limitations Before Plaintiffs have Notice that Defendants Acted with
       Scienter ........................................................................................................ 3

   3.  Plaintiffs Were Not on Inquiry Notice as of December 2005 .................... 4

       a)  The June 8, 2005 NASD Disclosure Does Not Constitute
           Inquiry Notice ................................................................... 5

       b)  The Siemers Action did not put Plaintiffs on Inquiry Notice ......... 7

       c)  SEC Filings and Defendants' "Public Disclosure" in
           December 2005 did not put Plaintiffs on Inquiry Notice .............. 9

   4.  Even if Inquiry Notice Existed, Plaintiffs Exercised Reasonable
       Diligence In Discovering the Fraud ......................................................... 10

   5.  The Siemers Action Tolled the Statute of Limitations ............................. 11

   6.  Defendants' Continued Revenue-Sharing At the Time of the Filing
       Defeats Defendants' Argument That the Complaint is Time-Barred ........ 14

III.  THE STATUTE OF REPOSE DOES NOT BAR PLAINTIFFS' CLAIMS
      PRIOR TO APRIL 3, 2003 ....................................................................... 14

IV.  DEFENDANTS' FAILURE TO DISCLOSE THAT THEY USED $350
     MILLION FOR REVENUE-SHARING KICKBACKS IS MATERIAL
     INFORMATION ......................................................................................... 15

V.  THE COMPLAINT ADEQUATELY PLEADS RELIANCE ....................... 19

VI.  THE COMPLAINT ADEQUATELY PLEADS SCIENTER ........................ 20

VII.  PLAINTIFFS ARE NOT REQUIRED TO PLEAD WITH
      PARTICULARITY THE GARTENBERG FACTORS ................................ 23

VIII.  THE COMPLAINT ADEQUATELY PLEADS CAUSATION ..................... 23

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**<u>FEDERAL CASES</u>**

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972)....................................................................................................... 19

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
    No. 07-4500, 2009 WL 213095 (3d Cir. Jan. 30, 2009) ........................................ 3

*In re Am. Funds Sec. Litig.*,
    556 F. Supp. 2d 1100 (C.D. Cal. 2008) ....................................................................... 8

*Am. Pipe & Constr. Co. v. Utah*,
    414 U.S. 538 (1974)....................................................................................................... 11

*Andrews v. Orr*,
    851 F.2d 146 (6th Cir. 1988) ...................................................................................... 13

*Basch v. Ground Round, Inc.*,
    139 F.3d 6 (1st Cir. 1998) ........................................................................................... 13

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)....................................................................................................... 15

*Betz v. Trainer Wortham & Co.*,
    519 F.3d 863 (9th Cir. 2008)............................................................................... *passim*

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
    182 F.3d 1096 (9th Cir. 1999) .................................................................................... 25

*Briskin v. Ernst & Ernst*,
    589 F.2d 1363 (9th Cir. 1978) ............................................................................... 6, 10

*Catholic Soc. Servs., Inc. v. INS*,
    232 F.3d 1139 (9th Cir. 2000) .............................................................................. 11, 12

*Crown, Cork & Seal Co. v. Parker*,
    462 U.S. 345 (1983)................................................................................................. 11, 13

*Davis v. Scherer*,
    468 U.S. 183 (1984)......................................................................................................... 2

*In re Discovery Zone Sec. Litig.*,
    181 F.R.D. 582 (N.D. Ill. 1998) ................................................................................. 15

*In re Dynex Captial, Inc. Sec. Litig.*,
    No. 05 Civ. 1897, 2006 WL 314524 (S.D.N.Y. Feb. 10, 2006)............................ 14

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)......................................................................................................... 3

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    352 F. Supp. 2d 429 (S.D.N.Y. 2005) ............................................................. 15

*Freedman v. Louisiana-Pacific Corp.*,
    922 F. Supp. 377 (D. Or. 1996) ...................................................................... 17

*Gomez v. St. Vincent Health, Inc.*,
    08-cv-153 DFH, 2008 WL 5247281 (S.D. Ind. Dec. 16, 2008) ............... 11, 12, 13

*Grandon v. Merrill Lynch & Co.*,
    147 F.3d 184 (2d Cir. 1998) ................................................................ 19, 24, 25

*Gray v. First Winthrop Corp.*,
    82 F.3d 877 (9th Cir. 1996) ............................................................................. 2

*Griffin v. Singletary*,
    17 F.3d 356 (11th Cir. 1994) ......................................................................... 13

*Guenther v. Cooper Life Scis., Inc.*,
    No. C-89-1823, 1992 WL 206256 (N.D. Cal. Apr. 7, 1992) ......................... 6, 10

*In re Initial Pub. Offering Sec. Litig.*,
    No. 21 MC 92, 2007 WL 2609585 (S.D.N.Y. Aug. 30, 2007) ..................... 12, 13

*Korwek v. Hunt*,
    827 F.2d 874 (2d Cir. 1987) ........................................................................... 12

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d 1230 (N.D. Cal. 2008) .......................................................... 20

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
    416 F.3d 940 (9th Cir. 2005) ........................................................................ 2, 8

*Luke v. Lincoln Nat'l Life Ins.*,
    No. Civ. A. 03-256, 2006 WL 297761 (E.D. Tex. Feb. 8, 2006) ......................... 8

*Middlesex Retirement Sys. v. Quest Software, Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ........................................................... 20

*Moser v. Triarc Co.*,
    05-cv-1742 LAB, 2007 WL 1111245 (S.D. Cal. Mar. 29, 2007) ...................... 14

*Newman v. Warnaco Group, Inc.*,
    335 F.3d 187 (2d Cir. 2003) ............................................................................. 6

*Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*,
    840 F. Supp. 243 (S.D.N.Y. 1993) .................................................................... 8

*Robbin v. Fluor Corp.*,
    835 F.2d 213 (9th Cir. 1987) ......................................................................... 13

*Rochelle v. Marine Midland Grace Trust Co. of N.Y.*,
    535 F.2d 523 (9th Cir. 1976) ........................................................................... 6

*Rubinstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) ................................................................................................ 17

*Salazar-Calderon v. Presidio Valley Farmers Ass'n*,
    765 F.2d 1334 (5th Cir. 1985) ........................................................................................... 13

*Schur v. Friedman & Shaftan, P.C.*,
    123 F.R.D. 611 (N.D. Cal. 1988) ...................................................................................... 12

*SEC v. Zanford*,
    535 U.S. 813 (2002) .......................................................................................................... 24

*Shields v. Smith*,
    No. C-90-0349, 1992 WL 295179 (N.D. Cal. Aug. 14, 1992) ........................................... 12

*Siemers v. Wells Fargo & Co.*,
    243 F.R.D. 369 (N.D. Cal. 2007) ................................................................................ 19, 24

*Siemers v. Wells Fargo & Co.*,
    No. C 05-04518 WHA, 2007 WL 1140660 (N.D. Cal. Apr. 17, 2007) ....................... *passim*

*Siemers v. Wells Fargo & Co.*,
    No. C 05-04518 WHA, 2006 WL 235541 (N.D. Cal. Aug. 14, 2006) ................. 9, 19, 23, 24

*Siemers v. Wells Fargo & Co.*,
    No. C 05-04518 WHA, 2007 WL 760750 (N.D. Cal. Mar. 9, 2007) .......................... *passim*

*In re Silicon Graphics Sec. Litig.*,
    183 F. 3d 970 (9th Cir. 1999) ........................................................................................... 20

*Staehr v. Hartford Fin. Servs.*,
    547 F.3d 406, (2d Cir. 2008) .............................................................................................. 6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007) ................................................................................................. 2, 20

*Thompson v. Davis*,
    295 F.3d 890 (9th Cir. 2002) .............................................................................................. 2

*Yang v. Odom*,
    392 F.3d 97 (3d Cir. 2004) .......................................................................................... 12, 13

*In re Zoran Corp. Derivative Litig.*,
    511 F. Supp. 2d 986 (N.D. Cal. 2007) ............................................................................... 15

**STATE CASES**

*Grisham v. Philip Morris U.S.A., Inc.*,
    40 Cal. 4th 623 (Cal. 2007) .............................................................................................. 14

**FEDERAL STATUTES**

15 U.S.C. §78u-4(b)(2) ............................................................................................................ 20

## FEDERAL RULES

Fed R. Civ. P. 15(a) ..................................................................................................... 25

Plaintiffs Edward Lee, Edward Arsenault, Emil de Bacco, Richard Hinton, Arnold Kreek, and Margaret Macht ("Plaintiffs") respectfully submit the following in opposition to defendants Wells Fargo & Co., Wells Fargo Funds Management, LLC, and Wells Fargo Funds Trust's ("Defendants" or "Wells Fargo") motion to dismiss Plaintiffs' Amended Complaint ("Complaint") (Dkt 65) ("Defs.' Mem").

## **INTRODUCTION**

This action seeks to recover hundreds of millions of dollars in inadequately disclosed kickback payments that Defendants made to dealers of the Wells Fargo funds as motivation to spur these dealers to sell even more Wells Fargo funds. These payments came from the fees Defendants charged to investors that Defendants falsely claimed would be used for management purposes.

This action is premised on the same type of "revenue-sharing" kickback scheme at issue in *Siemers v. Wells Fargo & Co.*, Case No. 05-cv-4518. This action seeks to obtain recovery for subclasses of investors not covered by the *Siemers* settlement previously approved by the Court.

Defendants move to dismiss this action on a variety of grounds, all of which are without merit. First, Defendants seek dismissal on statute of limitations grounds claiming that ***inquiry notice*** triggered the statute of limitations to run more than two years before the filing of the initial complaint in this action. Defendants' argument is contrary to the Ninth Circuit's most recent decision on the matter in *Betz v. Trainer Wortham & Co.*, 519 F.3d 863 (9th Cir. 2008). Defendants' argument is also incorrect because the *Siemers* action tolled any statute of limitations. Furthermore, the fact that Defendants still engaged in inadequately disclosed revenue-sharing when the initial complaint in this action was filed also defeats Defendants' argument.

Perhaps realizing the futility of their statute of limitations argument, Defendants also make a number of garden-variety arguments seen in every securities case (*e.g.* failure to sufficiently plead materiality, scienter, loss causation, etc.). Defs.' Mem. at 9-25. All of these arguments merely repeat arguments already made in *Siemers* that this Court has rejected. These arguments should be rejected again as the Complaint more than adequately pleads a case of fraud whereby Defendants misappropriated no less than ***$360 million*** in investors' money to pay undisclosed kickbacks.

<u>**ARGUMENT**</u>

**I.   <u>STANDARD OF REVIEW</u>**

Under Federal Rule of Civil Procedure 12(b)(6), a district court may dismiss a complaint only if it fails to state a claim upon which relief can be granted. *See Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002). The question is not whether a plaintiff will prevail in the action, but whether it is entitled to offer evidence in support of its claim. *See Davis v. Scherer*, 468 U.S. 183 (1984). In answering this question, the Court must "accept all factual allegations in the complaint as true." *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007).

**II.   <u>THIS ACTION IS TIMELY</u>**

Defendants argue that the action is untimely under the theory that all class members were on inquiry notice more than two years before this action was filed. Defs.' Mem. at 2-6. As set forth below, Defendants are wrong. First, under the governing Ninth Circuit authority of *Betz*, 519 F.3d at 877, Defendants have failed to meet the exacting standard of inquiry notice. Second, the prior filed *Siemers* action effectively tolled the statute of limitations. And third, because Defendants were still engaged in inadequately disclosed revenue-sharing between June 5, 2005, the close of the class period in *Siemers*, and April 4, 2008, the date the initial complaint was filed in this action, the statute of limitations had not run at the time this action commenced on April 4, 2008.

**1.   A Determination of Inquiry Notice is Inappropriate on a Motion to Dismiss**

The Ninth Circuit has erected a high bar – the highest of any Circuit – for deciding the issue of inquiry notice as a matter of law, holding that it is appropriate only when "uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered the fraudulent conduct." *Gray v. First Winthrop Corp.*, 82 F.3d 877, 881 (9th Cir. 1996) (internal quotation omitted); *see also Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 950-51 (9th Cir. 2005) ("the question of what a reasonably prudent investor should have known is particularly suited to a jury determination") (internal quotation omitted). Indeed, in its recent seminal decision on the inquiry notice standard, the Ninth Circuit held that even at the summary judgment stage after full discovery, "the defendant bears a considerable burden in demonstrating . . . that the plaintiff's

claim is time barred." *Betz*, 519 F.3d at 877.  As set forth more fully below, Defendants have failed to discharge this extraordinarily heavy burden and, therefore, Defendants' motion to dismiss must be denied.[1]

**2.      Inquiry Notice Does not Trigger the Running of the Statute of Limitations Before Plaintiffs have Notice that Defendants Acted with Scienter**

The Ninth Circuit has adopted the "inquiry-plus-reasonable-diligence test" to determine when the statute of limitations begins running in a Section 10(b) action.  *Id.* at 876.  Under this test, a court first determines when the plaintiff had inquiry notice of the facts giving rise to his securities claim.  *Id.*  The second stage asks "whether the plaintiff exercised reasonable diligence in investigating the facts underlying the alleged fraud."  *Id.* at 877.

In the Ninth Circuit, the facts constituting inquiry notice "must be sufficiently probative *of fraud* – sufficiently advanced beyond the stage of a mere suspicion to incite the victim to investigate."  *Id.* at 876 (emphasis added) (internal quotation omitted).  The Ninth Circuit has held that a plaintiff is not on inquiry notice just because plaintiff has discovered evidence that suggests a *possible* falsehood; *rather*, the clock does not start ticking until the plaintiff discovers facts providing evidence that Defendants acted *with scienter*, or in other words, "*evidence that the defendants had intentionally or deliberately and recklessly misled*" plaintiff.  *Id.* at 878 (emphasis added).  *See also Alaska Elec. Pension Fund v. Pharmacia Corp.*, No. 07-4500, 2009 WL 213095, at *5 (3d Cir. Jan. 30, 2009) ("Inquiry notice requires storm warnings of 'culpable activity' ... "[u]nder § 10(b), a corporation does not engage in culpable activity unless it acted with scienter.").[2]

In *Betz*, the plaintiff, who alleged that defendants had orally promised a high return, no risk investment, sued defendants for violation of Section 10(b).  Defendants moved for summary judgment arguing that the plaintiff was on inquiry notice that she had been defrauded more than two

---

[1] Defendants' argument that the threshold for finding inquiry notice is low (Defs.' Mem. at 2) relies on a 2003 district court decision and ignores the Ninth Circuit's recent decision in *Betz*.

[2] To state a valid claim under Rule 10b-5, a plaintiff must show, among other things, that the defendant acted with "an intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).

years before she filed suit by virtue of the fact that she had received account statements reflecting a steadily declining principal balance (which seemed to belie the promise of no risk) and a written contract stating her investment was "subject to investment risk and a possible loss of principal." *Betz*, 519 F.3d at 867.   Notwithstanding these facts, the Ninth Circuit reversed the district court's order granting defendants' motion for summary judgment on statute of limitations grounds holding that a reasonable juror could find that the plaintiff was not on inquiry notice that she had been defrauded until defendants finally told the plaintiff that they would not make good on her losses.  *Id.* The Ninth Circuit held that this was the case even though more than two years prior to the filing of the lawsuit an employee of the defendant had stated to the plaintiff that there was a "serious problem" with her account.  *Id.* at 872.

In addition, the Ninth Circuit held that even if the plaintiff was on inquiry notice of fraud, it could not say, as a matter of law, that the plaintiff, in the exercise of reasonable diligence, should have discovered the facts constituting the alleged fraud more than two years before the action was brought.  *Id.* at 878.

As set forth more fully below, Defendants fail to meet the stringent standard for inquiry notice set forth in *Betz* and their motion therefore must be denied.

### 3.    <u>Plaintiffs Were Not on Inquiry Notice as of December 2005</u>

Defendants argue that Plaintiffs were on inquiry notice no later than December 2005.  In support of their contention, Defendants cite: (i) the June 8, 2005 NASD announcement that it had fined fifteen brokers, including Wells Fargo Investments, LLC and H.D. Vest, a non-bank affiliate of Wells Fargo, in connection with the receipt of directed brokerage in exchange for preferential treatment for certain mutual fund companies; (ii) the filing of the *Siemers* action in November 2005 and press releases giving notice of the filing of the lawsuit as required by the PSLRA; and (iii) a December 2005 so-called "Disclosure Statement" issued by Wells Fargo, which defendants argue acknowledged that defendant Wells Fargo Funds Management, LLC ("Wells Fargo Funds Management" or "WFFM") had made revenue-sharing payments which were in addition to the sales charges and fees that were disclosed in the fee tables, prospectuses and statements of additional

information of the Wells Fargo funds.  None of these disclosures, however, whether considered individually or collectively, is sufficient to permit this Court to hold as a matter of law consistent with the standard articulated in *Betz* that Plaintiffs were on inquiry notice.

> **a)**      **The June 8, 2005 NASD Disclosure Does Not Constitute Inquiry Notice**

As an initial matter, it is disingenuous for Defendants to cite the June 8, 2005 NASD news release as evidence that Plaintiffs' claims are time-barred given this Court's prior observation that discovery in the *Siemers* case revealed that Wells Fargo disclosed to regulators less than one-third of the revenue sharing actually paid.  *Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2007 WL 1140660, at *1 (N.D. Cal. Apr. 17, 2007).  In any event, while the June 8, 2005 NASD news release announced that the NASD imposed fines on 15 broker-dealers in connection with the receipt of directed brokerage in exchange for preferential treatment, this announcement provided no evidence that Defendants' prospectuses were intentionally, deliberately or recklessly misleading, as is required for violations under §10(b) of the Securities Exchange Act of 1934 ("Exchange Act").  The NASD news release merely listed the ***broker-dealers*** that were fined and stated that the cases involved violations ***by brokers*** of NASD's Anti-Reciprocal Rule.  The NASD action ***did not fine any of the Defendants sued in this action.***  *See* Ex. A to Defendants' Request for Judicial Notice in Support of Motion to Dismiss ("Request for Judicial Notice").  Thus, the information provided in the NASD news release did not put Plaintiffs on inquiry notice of the fraud alleged in this case, *i.e.*, that the fund sponsor Defendants at issue here knowingly, intentionally or recklessly made materially false and misleading disclosures in the Wells Fargo Fund prospectuses regarding the funds' fees and costs and revenue sharing.  In this regard, it is worth noting that although the SEC sanctioned numerous investment advisers around the same time, the SEC did not sanction the Wells Fargo funds investment adviser (*i.e.* the defendant in this action).  It also should be noted that discovery revealed that Defendants understated to regulators investigating them the amount of revenue-sharing at issue.  *Siemers*, 2007 WL 1140660, at *1.

In order to establish inquiry notice, the triggering data must "relate directly to the misrepresentations and omissions" alleged.  *Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193

(2d Cir. 2003).  There is no detail whatsoever in the NASD news release about any specific alleged misrepresentations by Defendants in this case.  In fact, there is no company-specific information about any of the companies listed in the NASD news release other than the amount of the fine levied on each brokerage.  The lack of specific company information provided in the NASD news release is further support that the NASD news release did not put Plaintiffs on inquiry notice of the specific fraud alleged in the Complaint.  *See Staehr v. Hartford Fin. Servs.*, 547 F.3d 406, 428 (2d Cir. 2008) ("Because nearly all of the stories in the record are devoid of company-specific information, the argument that they constitute 'storm warnings' is far from compelling.").

Furthermore, the various news reports about the NASD news release cited by Defendants (Exs. MM-PP to Request for Judicial Notice) contain no further detail beyond what was already stated in the release itself.  In any event, "mass media reports do not generally place investors on inquiry notice as a matter of law."  *Guenther v. Cooper Life Scis., Inc.*, No. C-89-1823, 1992 WL 206256, at *7 (N.D. Cal. Apr. 7, 1992); *see also Rochelle v. Marine Midland Grace Trust Co. of N.Y.*, 535 F.2d 523, 532 (9th Cir. 1976) ("situations will rarely arise when we can say that public notoriety about a corporations' financial condition is sufficiently great to charge an investor with such knowledge as a matter of law.").

Defendants' argument that the publication of the NASD news release in the NASD's monthly report of "Disciplinary and Other NASD Actions" (Ex. B to Request for Judicial Notice) triggers inquiry notice is unavailing for the same reasons.  Besides the fact that the news release is buried on page 17 of a 19 page industry trade publication, publication in industry trade reports does not put plaintiffs on inquiry notice.  *Briskin v. Ernst & Ernst*, 589 F.2d 1363, 1367 (9th Cir. 1978) (refusing to impute knowledge of an article in a trade paper when plaintiffs denied having read the article despite the fact that three of the plaintiffs subscribed to the trade paper); *Guenther,* 1992 WL 206256, at *7 ("[T]he Ninth Circuit has refused to impute notice to shareholders on the basis of trade publication reports.").  In any event, like the press reports about the NASD news release cited by Defendants, the monthly report of disciplinary actions adds nothing more in the way of detail beyond what was stated in the NASD news release and certainly nothing sufficient to meet the

standard for inquiry notice established in *Betz*.

Defendants' argument that the NASD news release placed Plaintiffs on inquiry notice because Plaintiffs discussed the news release in their complaint is disingenuous. This merely indicates that Defendants' scheme to conceal their activity had begun to unravel, not that sufficient facts were public at that point to provide inquiry notice. Nor is the fact that the plaintiffs in *Siemers* chose to end the class period on the date of the NASD release probative of inquiry notice. To the contrary, the ending date of the *Siemers* class period is probative of plaintiffs' belief at that time that the practices of revenue sharing **ceased** with the NASD consent order. As discovery in the *Siemers* case later revealed, however, these practices and more importantly, Defendants' false and misleading disclosures about them, continued even well after the NASD consent order. These facts only became public with the Court's orders denying the motion to dismiss the Third Amended Complaint in April 2007. Therefore, the statute of limitations cannot be said to have run with respect to claims asserted here on behalf of persons who purchased after June 8, 2005, who were not even a part of the *Siemers* action.[3]

  b)   **The *Siemers* Action did not put Plaintiffs on Inquiry Notice**

---

[3] Assuming *arguendo* that this Court can find inquiry notice as a matter of law, which Plaintiffs contest, April 11, 2006 is the earliest it can possibly be said that sufficient facts became public to raise the requisite strong inference that Defendants acted with scienter in making misleading disclosures regarding revenue sharing and fees in the Wells Fargo funds prospectuses. This is the date the first Amended Class Action Complaint in *Siemers* was filed based on, *inter alia*, information provided to counsel by confidential sources. The first Amended Complaint contained significantly greater detail than the original *Siemers* complaint concerning the extent of the revenue-sharing program and the real conflict of interests it created, which was hidden from investors. A more appropriate point for finding inquiry notice as a matter of law is April 17, 2007, when this Court's opinion sustaining the Third Amended Complaint in *Siemers* published facts obtained in discovery demonstrating the breadth and magnitude of Defendants' revenue sharing payments based on confidential, internal Wells Fargo documents previously in Defendants' exclusive custody and control. This date also marks when the emphasis of the action shifted dramatically from focus on the brokers (who are not named in the above-captioned action) to the Wells Fargo fund sponsors (the only named defendants in the above-captioned action). These allegations concerning the size and scope of the revenue sharing were critical to the Court's finding that sufficient facts had been pled to raise a strong inference that Defendants' prospectus disclosures were intentionally, deliberately or recklessly misleading. *See Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2007 WL 760750, at *11 (N.D. Cal. Mar. 9, 2007) ("To solicit investments without disclosing such important ongoing hazards would be deceptive – just as it would be deceptive to market a fund without disclosing an ongoing embezzlement or other diversion scheme."). In either event, this action filed on April 4, 2008 is timely.

Defendants' present contention that all of the facts necessary to put Plaintiffs on inquiry notice were disclosed as early as November 2005 when the original *Siemers* complaint was filed stands in stark contrast to their repeated arguments in that case that each of the filed complaints, including the 143-page Third Amended Complaint filed in March 2007, failed to allege sufficient facts to give rise to a strong inference of scienter.  In any event, the original complaint in the *Siemers* action and the PSLRA-required notices over the wires announcing its filing were insufficient to put Plaintiffs on inquiry notice under the *Betz* standard.

As a general matter, the filing of a prior class action lawsuit does not as a matter of law put plaintiffs on inquiry notice.  *See Luke v. Lincoln Nat'l Life Ins.,* No. Civ. A. 03-256, 2006 WL 297761, at *5 (E.D. Tex. Feb. 8, 2006) (plaintiffs were not on inquiry notice where a class action suit was filed against defendants asserting the same claims for the same alleged fraud); *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 254 (S.D.N.Y. 1993) (plaintiff was not put on inquiry notice more than a year prior to the commencement of the action where three pending civil actions related to the same conduct against the same defendants were filed); *see also Livid Holdings Ltd.*, 416 F.3d at 950-51 (filing of an action in bankruptcy court did not put plaintiffs on inquiry notice).[4]  Such is the case here.

In this regard, as this Court stated in its March 9, 2007 decision in the *Siemers* case, that action "began with an emphasis on brokers steering their clients into certain mutual funds via supposedly unbiased recommendations without disclosing to their clients that the brokers were receiving secret compensation for making the recommendations."  *Siemers*, 2007 WL 760750, at *4.  It was not until the Third Amended Complaint was filed that the focus of the *Siemers* action dramatically shifted to the fraud alleged in this case – *i.e.*, that the prospectuses for the Wells Fargo funds were knowingly or recklessly false and misleading because they "concealed a scheme to

---

[4] The decision in *In re American Funds Securities Litigation*, 556 F. Supp. 2d 1100 (C.D. Cal. 2008), cited by Defendants (Defs.' Mem. at 5-6), is on appeal to the Ninth Circuit.  Contrary to the standard articulated in *Betz*, while acknowledging that the prior filed complaint alleged different legal causes of action, the court in *American Funds* did not consider whether the facts disclosed in the news articles and the earlier filed complaint "provided . . . evidence that the defendants had intentionally or deliberately and recklessly misled" the plaintiffs as is required to state a claim for violation of Section 10(b).  *Betz*, 519 F.3d at 878.

misappropriate investors' money and to divert it to brokers as kickbacks to reward ongoing sales of the fund." *Id.* at \*5.  The facts necessary to support this claim of fraud (and in particular raise the requisite strong inference of scienter necessary to state a Section 10(b) claim) are not contained in the first *Siemers* complaint, but rather were developed through the investigation of plaintiffs' counsel including interviews of confidential sources and discovery.  These facts were not fully disclosed until April 17, 2007, when previously undisclosed facts necessary to give rise to a strong inference of scienter that had been exclusively in Defendants' possession were discussed in this Court's order denying Defendants' motion to dismiss the Third Amended Complaint.[5]  Further, this Court heavily relied on the incomplete and misleading disclosures in the Wells Fargo funds prospectuses detailed in the Third Amended Complaint in finding that scienter had been adequately alleged.  *Siemers*, 2007 WL 1140660, at \*12.[6]

> c)    **SEC Filings and Defendants' "Public Disclosure" in December 2005 did not put Plaintiffs on Inquiry Notice**

Defendants' argument that Wells Fargo's filing of the *Siemers* complaint with the SEC on December 1, 2005 (*see* Defs.' Mem. at 4) also put Plaintiffs on inquiry notice is disingenuous.  Defendants provide no support for this contention.  Specifically, Defendants fail to set forth any facts that show that the *Siemers* complaint was actually available on the SEC's website.  Defendants have merely attached a letter which they mailed to the SEC which indicates that the Chief Legal Officer of WFFM was providing the *Siemers* complaint to the SEC, pursuant to the Investment Company Act of 1940.  There are no instructions in the letter to make the complaint publicly

---

[5] Factual allegations contained in the Third Amended Complaint drawn from documents and testimony produced in discovery were redacted from the publicly filed complaint.  Thus, these facts did not become public until they were cited in the Court's opinions sustaining the complaint.

[6] Moreover, this Court's order granting in part and denying in part the motion to dismiss the first Amended Complaint cited allegations based on confidential sources not found in the original *Siemers* complaint in finding that facts necessary to raise the requisite strong inference of scienter were present.  *See Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2006 WL 2355411, at \*9 (N.D. Cal. Aug. 14, 2006).  Hence, even assuming *arguendo* that the statute of limitations began to run with the filing of the first Amended Complaint in *Siemers* on April 11, 2006, this action, which was filed on April 4, 2008, was commenced within two years from that date and, therefore, is timely.

accessible, and Defendants have provided no evidence that it was actually made public.  In any event, "the court need not reach this issue because reasonably diligent shareholders do not, as a matter of law, have a duty to examine document filings with the SEC." *Guenther*, 1992 WL 206256, at *4; *see also Briskin,* 589 F.2d at 1368.  This argument should therefore be disregarded.

Similarly, the so-called "Disclosure Statement" in December 2005 acknowledging that Wells Fargo Investments had made revenue-sharing payments was not sufficient to put Plaintiffs on inquiry notice.  Significantly, Defendants have not attached this document to their Request for Judicial Notice, nor have they presented any evidence regarding how the document became public and whether its publication was widespread.  Indeed, the first citation Defendants provide is to the Second Amended Complaint in the *Siemers* action, which was not filed until August 31, 2006. Thus, even assuming *arguendo* that the mention of this document in the Second Amended Complaint was sufficient to provide inquiry notice, this action is timely as it was brought less than two years after the date the Second Amended Complaint in *Siemers* was filed.

### 4.   Even if Inquiry Notice Existed, Plaintiffs Exercised Reasonable Diligence In Discovering the Fraud

The second prong of the inquiry notice test is whether plaintiffs exercised reasonable diligence in investigating the facts underlying the alleged fraud.  *Betz*, 519 F.3d at 877.  In *Betz*, the Ninth Circuit held that a defendant's assurances that they did nothing wrong has the effect of "lulling the [plaintiff] and delaying the onset of legal action …[such that it] preclude[s] summary judgment and create[s] an issue for the trier of fact as to when the statute of limitations began to run." *Id.* at 879.

Here, Defendants moved to dismiss the first Amended Complaint in *Siemers* arguing, *inter alia*, that revenue sharing was a lawful practice and that Defendants' prospectus disclosures were in full compliance with the securities laws and applicable regulations.  As a result, Defendants argued that there was nothing in the first Amended Complaint to suggest intentional or conscious misconduct as is required for Section 10(b) liability.  *Siemers v. Wells Fargo & Co.*, case no. 05-cv-04518, Motion to Dismiss dated May 2, 2006 (*Siemers* Dkt. 66) at 22.  As was the case in *Betz*,

Defendants' denials of the allegations in the first Amended Complaint in *Siemers* give rise to a factual issue which requires the Court to deny Defendants' motion to dismiss on statute of limitations grounds.

### 5.      The *Siemers* Action Tolled the Statute of Limitations

Even if Plaintiffs were on inquiry notice as Defendants claim, the action is nevertheless timely because the *Siemers* action tolled the statute of limitations with respect to Plaintiffs' claims. In *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), the Supreme Court found that commencement of a class action tolls the running of the statute of limitations for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status. *Id.* at 552-53. In so doing, the Court balanced the purposes behind class actions and statute of limitations since class actions promote "efficiency and economy of litigation" and statute of limitations "promote justice by preventing surprises through the revival of claims that have been allowed to slumber." *Id.* at 553-54. Later, in *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353 (1983), the Supreme Court held that *American Pipe* tolling extended not only to plaintiffs who intervene in a continuing action, but also to plaintiffs who seek to file an entirely new action, reasoning that the rationale supporting tolling articulated in *American Pipe* was equally applicable "regardless of the method class members choose to enforce their rights upon denial of class certification." Although neither *American Pipe* nor *Crown* specifically addressed whether subsequent to the denial of class certification plaintiffs "whose individual actions are not barred may be permitted to use a class action to litigate those actions," *Catholic Soc. Servs., Inc. v. INS*, 232 F.3d 1139, 1147 (9th Cir. 2000), "[n]othing in the Supreme Court's reasoning is limited to individual suits as distinct from fresh attempts to certify a class," *Gomez v. St. Vincent Health, Inc.*, 08-cv-153 DFH, 2008 WL 5247281, at *7 (S.D. Ind. Dec. 16, 2008). Indeed, "[t]he Court's broad language seems to encourage tolling regardless of differences in procedures." *Id.* Such a rule is consistent with Supreme Court precedent acknowledging "that class plaintiffs often will have the capability to pursue their claim only in a class action." *Id.*

The Ninth Circuit has interpreted *American Pipe* to allow tolling of the statute of limitations

with respect to a subsequent class action unless plaintiffs in the second action seek merely to re-litigate the correctness of a previous denial of class certification. *Catholic Soc. Servs.*, 232 F.3d at 1147-49. When, as in this case, however, a subsequent class action seeks certification of a different and narrower class than in the previous action, *American Pipe* tolling indeed applies. *See Yang v. Odom*, 392 F.3d 97, 105 (3d Cir. 2004) (agreeing with cases that refuse to toll limitations periods for "substantively identical class actions," but observing that tolling was not foreclosed "for subsequent class actions asserting an appropriate scope"); *Korwek v. Hunt*, 827 F.2d 874, 879 (2d Cir. 1987) (leaving open "the question of whether the filing of a potentially proper subclass would be entitled to tolling under *American Pipe*"); *Gomez*, 2008 WL 5247281, at *10 ("Once the issue is fully and fairly litigated, plaintiffs should be estopped from trying to certify **the same class**.") (emphasis added); *In re Initial Pub. Offering Sec. Litig.*, No. 21 MC 92, 2007 WL 2609585, at *3 (S.D.N.Y. Aug. 30, 2007) (holding that "whether tolling continues after certification is denied depends on the facts and circumstances of each case and is not amenable to a bright-line rule," and that an appellate decision reversing class certification did not preclude plaintiffs from attempting to define a new class); *Shields v. Smith*, No. C-90-0349, 1992 WL 295179, at *3 (N.D. Cal. Aug. 14, 1992) (allowing tolling where plaintiff did not seek reconsideration of the Court's denial of class certification); *Schur v. Friedman & Shaftan, P.C.*, 123 F.R.D. 611 (N.D. Cal. 1988) (same).

Defendants' assertion that tolling is unavailable here because Plaintiffs seek to certify the same class as in *Siemers* (less Mr. Siemers' three funds) is factually incorrect. Defs.' Mem. at 8. In this case, unlike in *Siemers*, Plaintiffs are seeking certification of nine classes grouped by mutual fund type, which are substantially narrower and different than the single class encompassing all Wells Fargo funds sought in *Siemers*. Thus, unlike in *Korwek*, Plaintiffs in this action are not seeking to certify a class substantively identical to the one rejected in *Siemers*. Rather, this case presents the scenario left open in *Korwek* – *i.e.*, "whether the filing of a potentially proper subclass would be entitled to tolling under *American Pipe*," 827 F.2d at 879. This is what the court in *IPO*

1  allowed.  *In re Initial Pub. Offering*, 2007 WL 2609585, at *3.[7]

2          As the district court observed in *Gomez*, a rule precluding tolling in a subsequent class

3  action creates incentive for class members to file additional class actions before a class certification

4  decision is rendered because they cannot know how the court will rule or what the reasons for the

5  court's decision might be.  2008 WL 5247281, at *9.  "A rule that creates that incentive seems to

6  run contrary to the aim of *American Pipe* to avoid needless filings of repetitive claims."  *Id.*  As the

7  district court instructed in *Gomez*:

8          The *American Pipe* rule encourages unnamed plaintiffs to rely on the class action
           already filed on their behalf.  In *American Pipe* itself, the Supreme Court wrote:
9          "Not until the existence and limits of the class have been established and notice of
           membership has been sent does a class member have any duty to take note of the suit
10         or to exercise any responsibility with respect to it in order to profit from the eventual
           outcome of the case."

11

12  2008 WL 5247281, at *7 (internal citations omitted).[8]

13          Here, class action treatment of this action is the most efficient and judicious treatment for

14  Plaintiffs' claims.  *Gomez*, 2008 WL 5247281, at *8.  And Defendants would certainly not be

15  prejudiced by tolling as they were on notice.  *See Crown, Cork & Seal Co.*, 462 U.S. at 353

16  ("[t]olling the statute of limitations . . . creates no potential for unfair surprise, ***regardless of the***

17  ***method class members choose to enforce their rights upon denial of class certification***.")

18  (emphasis added); *Yang*, 392 F.3d. at 111 ("The defendants were on notice of the nature of the

19  claims and the generic identities of the plaintiffs within the required period, eliminating the

20  _____

21  [7]  Moreover, here, unlike in *Siemers*, Plaintiffs are seeking to certify Classes that include claims of
     purchasers of Wells Fargo mutual funds ***after*** June 8, 2005.  The proposed class period for the single
     class as to which the plaintiffs in *Siemers* sought certification ended on June 8, 2005.

22

23  [8]  The authorities cited by Defendants do not preclude tolling in this case.  As was the case in
     *Korwek*, in *Robbin v. Fluor Corp.*, 835 F.2d 213 (9th Cir. 1987) and *Basch v. Ground Round, Inc.*,
24   139 F.3d 6 (1st Cir. 1998), the plaintiff in the second action sought certification of the identical class
     that had been rejected in the first action.  In *Salazar-Calderon v. Presidio Valley Farmers
25   Association*, 765 F.2d 1334 (5th Cir. 1985), the same proposed class had been denied multiple times.
     The Eleventh Circuit's decision in *Griffin v. Singletary*, 17 F.3d 356 (11th Cir. 1994) and the Sixth
26   Circuit's decision in *Andrews v. Orr*, 851 F.2d 146 (6th Cir. 1988), which preclude tolling with
     respect to any later filed class action, are contrary to the Ninth Circuit's governing authority in
27   *Catholic Social Services, Inc.*

28

potential for unfair surprise and prompting them to preserve evidence which might otherwise have been lost."). Here, to deny putative class members tolling would frustrate the purposes of Rule 23 and the *American Pipe* rule.

### 6. Defendants' Continued Revenue-Sharing At the Time of the Filing Defeats Defendants' Argument That the Complaint is Time-Barred

In Defendants' most recent prospectuses, they meaningfully disclose to investors for the very first time that they continue to do revenue sharing, and that the amounts they pay brokers and other selling agents is significant, amounting to as much as 30% of the management fees charged to investors. *See* Reese Decl. Ex. A (copy of July 1, 2008 prospectus) at 17.[9] Because Defendants were actively making inadequately disclosed revenue-sharing payments at the time the initial complaint was filed in the above-captioned action, the statute of limitations could not possibly have been triggered prior to the filing of the complaint. Accordingly, because of this on-going conduct, this action cannot be time-barred. *See e.g. Moser v. Triarc Co.*, 05-cv-1742 LAB, 2007 WL 1111245, at *2-6 (S.D. Cal. Mar. 29, 2007) (in action based upon S-1 filings with the Securities and Exchange Commission, court denied motion to dismiss based upon statute of limitations holding that time did not start to run until defendant filed the last SEC form at issue); *see also Grisham v. Philip Morris U.S.A., Inc.*, 40 Cal. 4th 623, 637 (Cal. 2007) ("A defendant's fraud in concealing a cause of action against him will toll the statute of limitations, and that tolling will last as long as a plaintiff's reliance on the misrepresentations is reasonable.").

### III. THE STATUTE OF REPOSE DOES NOT BAR PLAINTIFFS' CLAIMS PRIOR TO APRIL 3, 2003

Defendants argue that Plaintiffs' claims based on alleged misrepresentations or omissions made more than five years before the action was filed are barred by the five-year statute of repose and seek to shorten the putative class period so that it begins no earlier than April 4, 2003. Defs.' Mem. at 9. However, the period of repose does not begin on April 4, 2003 but when the last alleged misrepresentation was made. *See In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897, 2006 WL

---

[9] These disclosures are made pursuant to the terms of the settlement in the *Siemers* action.

314524, *5 (S.D.N.Y. Feb. 10, 2006) ("In a case like this one, in which a series of fraudulent misrepresentations is alleged, this 'period of repose begins when the last alleged misrepresentation was made.'")[10]  Here, the last misrepresentation was made as recently as February 1, 2008, when Defendants sent investors prospectuses that continued to be misleading regarding the revenue-sharing scheme at issue here.  Reese Decl. Ex. B (copy of February 1, 2008 prospectus) at 32 (25 of 836).  Therefore, the statute of repose does not limit Plaintiffs' Class Period.  In any event, the statute of repose was tolled by the *Siemers* action.  *See In re Flag Telecom Holdings, Ltd. Sec Litig.*, 352 F. Supp. 2d 429, 455 (S.D.N.Y. 2005) (applying *American Pipe* tolling to statue of repose); *In re Discovery Zone Sec. Litig.*, 181 F.R.D. 582, 600 (N.D. Ill. 1998) (applying American Pipe tolling to statute of repose).

## IV.   DEFENDANTS' FAILURE TO DISCLOSE THAT THEY USED $350 MILLION FOR REVENUE-SHARING KICKBACKS IS MATERIAL INFORMATION

An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988).

Defendants argue that the Complaint fails to allege that its undisclosed revenue-sharing scheme was materially misleading.  Defs.' Mem. at 9-11.  Defendants are wrong.  Their argument both ignores the allegations of the Complaint as well as the prior rulings of the Court on the same issue.

Notably, the Complaint details that Wells Fargo made no less than *$350 million* in revenue-sharing payments to some 472 brokers during the Class Period.  These payments created a host of problems, including diminishing the amount of proposed class members' investments as well as creating undisclosed conflicts of interests between Wells Fargo mutual fund investors and the investment adviser for those mutual funds.  In other words, both the magnitude as well as the very

---

[10] Defendants rely on *In re Zoran Corp. Derivative Litigation*, 511 F. Supp. 2d 986, 1013-14 (N.D. Cal. 2007).  However, *In re Zoran* involved backdating stock options.  Cases involving stock option date manipulation are different from the type of case here in that they do not involve a continuous scheme over a period of time.

existence of the revenue-sharing scheme were material facts that an investor would want to know when making his decision whether or not to invest in Wells Fargo mutual funds.  As held by this Court in *Siemers*:

> The full extent-as well as the very existence-of the Wells Fargo revenue-sharing regime were material facts.  They would have been significant in the total mix of information for making an investment decision.  There are several reasons.  One reason was given by the [Securities and Exchange] Commission in its cease-and-desist orders – the magnitude and cost of the program had grown so large that the Wells Fargo fiduciaries were caught in a conflict of interest.  In order to find sources of cash to satisfy brokers demanding the alleged kickbacks, the fiduciaries had to choose between using their own money (as their fiduciary duty required) versus inflating their fees charged to investors (in violation of their fiduciary duty).  Short of dipping into their own money, in fact, the common fund was the only available source of funds of this scope.  The large magnitude of the fiduciaries' persisted need to pay 472 brokers on a continuing basis was material, for it would have informed and defined the conflict problem.  Investors would have wanted to know that this conflict would be hanging over their investments. This would be true even if, in the actual event, the fiduciaries never stepped over the line.  The existence and size of the conflict was a material fact.

*Siemers*, 2007 WL 1140660, at *6.

Despite the previous finding of this Court regarding materiality, Defendants claim that the Complaint does not plead materiality.  Defendants argue that "[t]he Complaint does not allege the existence of any laws or regulations requiring that a mutual fund prospectus disclose the details of a revenue-sharing program."  Defs.' Mem. at 10.  This is completely untrue.  The Complaint specifically cites to the Exchange Act, the Investment Company Act of 1940, and SEC Form N-1A, all of which govern the information to be disclosed in a prospectus. ¶164.[11]  Moreover, the Complaint alleges that Defendants' failure to disclose the revenue-sharing scheme in the prospectus violated the disclosure requirements set forth in these statutes and regulations.  ¶168.  The Complaint then quotes from numerous SEC cease-and-desist orders against mutual fund companies for violating the federal securities laws and the disclosure requirements of Form N-1A for failure to disclosure revenue-sharing schemes such as that at issue here. ¶¶168-169 (quoting from SEC cease-and-desist orders against Massachusetts Financial Services and Hartford Investment Financial Services, LLC and citing SEC actions against Putman Investment Management, LLC and Franklin

---

[11] Paragraph references ("¶__") or ("¶¶__") are to the Complaint.

Advisers, Inc.).

Moreover, in addition to having a duty to disclose pursuant to SEC regulations, Defendants' affirmative statements regarding the use of the fees imposed a duty to disclose.   "[W]hen a corporation makes affirmative statements which are rendered misleading by omissions of material facts, that corporation has a duty to disclose whatever additional information is necessary to rectify the misleading statements." *Freedman v. Louisiana-Pacific Corp.*, 922 F. Supp. 377, 387 (D. Or. 1996) (citing *Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994) ("[A] duty to speak the full truth arises when a defendant undertakes a duty to say anything.")  The Complaint details numerous instances where, although Defendants chose to speak, they failed to speak fully and truthfully concerning the facts at issue in this litigation. As summarized by the Court in  *Siemers*:

> One of the principal wrongs alleged here was that the fees were not being used in full for their ostensible purposes.   Rather, the funds' investors were being charged excessive fees to fund hidden revenue-sharing agreements.   Thus, the prospectuses misled shareholders by stating that the fees were being used for disclosed purposes when, instead, they were being used to market the funds by way of kickbacks to brokers…With respect to the 12b-1 distribution plan, the prospectuses were misleading because, rather than limiting the distribution payments to Class B and Class C shareholders, the sponsors used the assets of all shareholders, including Class A shareholders, to pay for distribution services by secretly funding the revenue-sharing arrangements.   In addition, the rule 12b-1 cap was not honored because fees in excess of the cap were being used to fund the hidden revenue-sharing scheme.

*Siemers*, 2007 WL 1140660, at *5.

Defendants also argue that even though Plaintiffs have identified the total amount of money alleged to be improper kickbacks – *i.e. $350 million* – that the Complaint is insufficient because it does not detail "how much in revenue-sharing (obtained by virtue of excessive fees) was paid by WFFM on behalf of any fund in any year." Defs.' Mem. at 10.[12]  The pleadings requirements to survive a motion to dismiss, however, do not require this level of detail.  As held by this Court:

---

[12] Defendants' claim that "Plaintiffs' failure to plead these facts [regarding the fees on a fund by fund analysis] cannot be excused by lack of access to WFFM documents" is disingenuous, at best. Defs.' Mem. at 11. As Defendants are well aware, Defendants refused to and failed to provide this level of detail for any funds other than those owned by Mr. Siemers – funds not at issue here.

> The defense insists that unless we know the extent of the excess, we cannot tell whether the amounts would have been material. Maybe, they suggest, the excess was tiny. We must not forget that defendants themselves refer to the payments at issue as "significant." This was set forth in most of the prospectuses at issue. Although those disclosures were allegedly inadequate in a multiple of ways, they repeatedly referred to the payments as "significant." Defendants may not walk away from these admissions. Moreover, *any* intentional misappropriation from the common fund would have been material to investors. The integrity of management is always of importance to investors. That a fiduciary has been misappropriating the common fund – even in small amounts – would be important to investors, for the next misappropriation or defalcation could be larger. Intentional misappropriation would always be a red flag, a negative risk factor of material interest to investors.

*Siemers*, 2007 WL 1140660, at *8 (emphasis in original).

Finally, Plaintiffs also expressly set forth for every fund owned by Plaintiffs the amount of fees being paid as a percentage of net assets. *See e.g.* ¶¶35, 39, 54, 56, 72, 73, 74, 76.


# REDACTED


Plaintiffs further demonstrate from internal emails that the amount of kickbacks were contingent on the amount of fees charged to the investors, so that if Wells Fargo Funds Management lowered its fee, the kickback would also be lowered by the identical amount. ¶143. Plaintiffs quote letters from the SEC to Wells Fargo stating that Wells Fargo had failed to demonstrate that its services justified the amount of fees being charged, and that the size of the fees suggested that portions of them might be going for improper kickbacks. ¶142. These internal emails are in addition to the rulings by the SEC, NASD, and state agencies against brokers who sold the Wells Fargo funds, which implicitly or explicitly concluded that the details about revenue sharing omitted from the Wells Fargo prospectuses were material. ¶¶144-146.

Plaintiffs cite additional internal Wells Fargo emails to selling agents admitting how important the kickbacks were in inducing sales: "We are convinced that the recent spike in sales is

1   directly traced to your sales desk having a contest and earning incentives." ¶151.  And Plaintiffs

2   plead that neither they nor other investors would have invested in the funds had the revenue-sharing

3   arrangements been disclosed.  ¶¶243-245.

4         Defendants apparently hope these allegations will disappear if they close their eyes tightly

5   enough.  These detailed allegations, however, cannot be ignored and they fully satisfy Plaintiffs'

6   obligation to plead materiality.

7   **V.**     **THE COMPLAINT ADEQUATELY PLEADS RELIANCE**

8         Because this case is fundamentally about Defendants' omissions of material facts, individual

9   reliance is presumed.  *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54

10  (1972) ("[p]ositive proof of reliance is not a prerequisite to recovery.  All that is necessary is that

11  the facts withheld be material in the sense that a reasonable investor might have considered them

12  important in the making of this decision.").  As previously recognized by this Court regarding Wells

13  Fargo's kickback scheme:

14        Finally, with respect to reliance, we are concerned here with half-truths.  The sale of
    mutual fund shares carries with it an implied representation that all fees, even high

15        fees, are used only for the authorized purposes and that there are no material
    conflicts of interests beyond those disclosed.  Prospective investors ordinarily so

16        presume.  They ordinarily presume that mutual fund fees, even if high, will be used
    for authorized purposes and will not be charades.  When the implied representations

17        are false, as here alleged, then reliance is presumed.

18  *Siemers*, 2007 WL 760750 at *14 citing *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 192-94 (2d

19  Cir. 1998) and *Affiliated Ute*, 406 U.S. 128, 153-54.  Defendants' nonetheless argue that *Affiliated*

20  *Ute* does not apply in this matter. Defs.' Mem. at 13.  Defendants are wrong. As stated previously

21  by the Court in this case:

22        In the instant case, we have just such a failure to disclose….Movants' argument
    conflicts with the express command of the Supreme Court in Affiliated Ute citizens

23        of Utah, which held that "positive proof of reliance is not a prerequisite" when the
    case involves "***primarily*** a failure to disclose," not ***exclusively*** a failure to disclose.

24        This order holds that plaintiff need not make independent allegations of reliance
    because he adequately pleads causation by accusing defendants of material

25        omissions resulting in half truths.

26  *Siemers*, 2006 WL 2355411, at *11 (emphasis in original).  *See also Siemers v. Wells Fargo & Co.*,

27  243 F.R.D. 369, 374 (N.D. Cal. 2007) ("Having been immersed in this case through so many

28

hearings, the Court is convinced that this action is primarily concerned with a key omission – the alleged studied refusal of the Wells Fargo sponsors to disclose their massive system of revenue sharing and its consequent financing such ongoing distribution from the investor's common fund (via sham fees) rather than from the sponsor's own money.   Therefore, this case meets the *Binder/Blackie* test for class application of the *Affiliated Ute* rule").

Accordingly, Defendants' motion to dismiss for failure to pled reliance is wrong and its reliance argument should be rejected.

## VI.   THE COMPLAINT ADEQUATELY PLEADS SCIENTER

For a claim brought pursuant to the federal securities laws, plaintiffs must plead with particularity facts raising a strong inference of the defendants' state of mind, or scienter.  *See* 15 U.S.C. §78u-4(b)(2).   The Ninth Circuit has interpreted the scienter pleading requirement as meaning that plaintiffs must plead "facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct."  *In re Silicon Graphics Sec. Litig.*, 183 F. 3d 970, 974 (9th Cir. 1999).

In *Tellabs*, the Supreme Court essentially adopted the Ninth Circuit's scienter pleading standard as the uniform standard.  *See Middlesex Retirement Sys. v. Quest Software, Inc.*, 527 F. Supp. 2d 1164, 1181 (C.D. Cal. 2007) ("in Tellabs the Supreme Court explicitly approved the Ninth Circuit's...standard"); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1246-50 (N.D. Cal. 2008) (denying motion to dismiss, holding that complaint adequately pled scienter under *Tellabs*).  Here, as detailed below, the alleged facts easily meet this pleading standard.  Indeed, on facts identical to those presented here, this Court in *Siemers* applied the Ninth Circuit pleading standard that was ultimately adopted in *Tellabs*, holding that these type of facts sufficiently plead scienter:

> In brief, Wells Fargo and its key officers plainly ***knew*** about its vast and secret programs of revenue sharing.  They could easily see that the secret program was not fairly disclosed in the prospectus.  That they went to some trouble to allude to it in vague and incomplete language and buried the passages in unexpected placements indicates that they knew of its significance, yet chose to mislead.  The revised complaint raises a strong inference of intentional misleading on a material investment consideration.

*Siemers*, 2007 WL 1140660, at *12 (emphasis in original).

Nonetheless, Defendants argue that "Plaintiffs' allegations of scienter are not detailed and specific and fail to give rise to a strong inference of scienter. They are improperly conclusory." Defs.' Mem. at 15. Defendants are wrong and their argument completely ignores the well-pled Complaint that cites internal Wells Fargo emails, NASD and SEC investigations of Defendants, internal charts and other documents that tracked the revenue-sharing payments, and Defendants' own sworn testimony that concretely establishes that Defendants had **actual knowledge** of the scheme at issue. *See* ¶¶139-153.

For example, the Complaint is replete with citations to internal Wells Fargo documents that show that the WFFM senior management not only knew about the kickbacks, but directly negotiated them. ¶¶136-143. Specifically, the Complaint quotes verbatim emails and other internal documents evidencing WFFM Presidents' negotiation of revenue-sharing payments with selling agents of the Wells Fargo Funds. *Id.* The Complaint also cites email between senior WFFM management and the brokerages receiving the kickbacks about the kickbacks achieving the desired effect of boosting sales of Wells Fargo funds:

> We believe more and more that the single greatest influence we can collectively have on your [H.D. Vest] advisors is through your sales desk. We also believe we have to get them more and more engaged in [Wells Fargo Funds]. ***We believe if we can own their minds, hearts and pocket books,*** we can exceed our sales plan with you. We are convinced that the recent spike in sales is directly traced to your sales desk having a contest and earning incentives.

¶151 (email between Matt Lobas, WFFM senior vice president and Roger Ochs, CEO of H.D. Vest brokerage, copying WFFM President Karla Rabusch) (emphasis added).

Likewise, Defendants' actual knowledge is evidenced through the "Wells Fargo Funds Management, LLC – Master List: Revenue Sharing Agreements" that are attached as Exhibit D to the Complaint ("Revenue Sharing Master List"). The Revenue Sharing Master List tracked the revenue-sharing agreements between WFFM and selling agents and included such information as the name of the selling agents with whom Wells Fargo had revenue-sharing agreements; the contact information of the selling agents; the selling agents' bank account numbers to which to route the money; the revenue sharing to be paid to the selling agents by Wells Fargo; and the date the

payments began for each selling agent.  ¶147.  Moreover, the Complaint established that WFFM senior executives, including WFFM's President, were well aware of the Revenue Sharing Master List by quoting an email between these senior executives in which they are discussing the Revenue Sharing Master List.  ¶148.

Contrary to Defendants' contention that these documents evidence Defendants' belief that revenue-sharing was entirely proper and that Defendants' disclosures concerning it were adequate (Defs.' Mem. at 19), the documents cited in the Complaint reflect concern on WFFM's part as to the impropriety of the revenue-sharing agreements.  For example, in an internal Wells Fargo email cited in the Complaint, WFFM's President and Lincoln Yersin, National Sales Manager for Wells Fargo Investments, it states that "Anything over that amount could be viewed as 'revenue share' *and that would be problematic.*"  ¶141.  (emphasis added).

Additionally, the Complaint alleges that the very persons in charge of the revenue-sharing negotiations with the selling agents were the same persons also in charge of determining what, if any, disclosures were made in the prospectuses (¶¶31, 131-132, 135-153, 164-167) and that these disclosures were deliberately "watered-down . . . to gloss over the true price of admission to investors and the magnitude of the conflict of interest" created by the massive revenue-sharing program.  *See Siemers*, 2007 WL 760750, at *12.  As alleged throughout the Complaint, these "disclosures" were deceptive, being couched in vague and incomplete language and buried deep within the prospectuses in unexpected places.  *See e.g.* ¶¶32-50.  *See also Siemers*, 2007 WL 760750, at *13 ("The vague disclosures - written in plain Greek - concealed thriving revenue-sharing schemes.").

With respect to scienter of the Wells Fargo Funds Trust Board, the Complaint also pleads actual knowledge of the revenue sharing arrangements that were misrepresented in the prospectuses. Notably, the President of the Board of Directors of Wells Fargo Funds Trust was simultaneously the President of WFFM.  As stated above, the Complaint is replete with allegations of how WFFM's President not only knew about the kickbacks, but directly negotiated them.  ¶¶136-143.

These facts and allegations belie Defendants' argument that the Complaint fails to allege

adequately that Defendants knew of the kickback arrangements.  Nonetheless, Defendants argue "the Complaint, case law, and secondary resources show that Plaintiffs' attempt to infer scienter is weak when compared with the competing inference that Defendants acted consistently with regulatory guidance and in accord with industry custom and practice."  Defs.' Mem. at 17.  This argument has already been rejected.  As held by this Court:

> Movants say that the complaint does not raise an inference that they acted with scienter. They argue that when they made the omissions, caselaw and relevant legal authority indicated that revenue-sharing was lawful. . . . The complaint, however, alleges a persistent and deliberate scheme to use half truths to conceal a thriving system of kickbacks and its concomitant conflicts of interest. . . . In light of this conscious strategy, the failure to disclose the full extent of the payback programs raises a strong inference of scienter.

*Siemers*, 2006 WL 235541, at *9.  Accordingly, Defendants' argument is without merit and should be denied.

## VII.   PLAINTIFFS ARE NOT REQUIRED TO PLEAD WITH PARTICULARITY THE *GARTENBERG* FACTORS

Ignoring this Court's precedent, Defendants argue that Plaintiffs must plead the elements of the various Gartenberg factors with particularity at the pleading stage.  Defs.' Mem. at 20-22. Tellingly, Defendants fail to cite a single case for this proposition.  Nor can they as Defendants are once again wrong.  As previously explained by this Court:

> Contrary to defendants, the proposed pleading adequately pleads the excessiveness of the fees. There is no requirement that the *Gartenberg* factors be pled and no decision so holds. That decision came after a full trial and was not a pleading case; moreover, it involved Section 36(b), not the 1933 and 1934 Acts.

*Siemers*, 2007 WL 760750, at *13.  Accordingly, Defendants' *Gartenberg* argument is without merit and should be denied.

## VIII.   THE COMPLAINT ADEQUATELY PLEADS CAUSATION

The Complaint adequately alleges loss causation.  Specifically, the Complaint alleges that Defendants improperly and secretly diverted investors' money for the undisclosed purpose of paying kickbacks to the selling agents of Wells Fargo Funds.  ¶¶243-245.  Despite these well-pled allegations, Defendants argue that a loss can only occur under the federal securities laws if a drop in

the stock price occurs after disclosure of the fraud. Defs.' Mem. at 22. Defendants are wrong. As previously stated by this Court with respect to Wells Fargo's revenue-sharing scheme:

> One measure of loss causation approved by the Supreme Court was the familiar story of a plummet in the share price after the truth became known. That, however, was only one way to plead loss causation, not the only way. The Supreme Court stated that "ordinary pleading rules are not meant to impose a great burden upon a plaintiff" and that "it should not prove burdensome for a plaintiff . . . to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005).
>
> Here, plaintiffs have provided such an indication. They allege that the loss was, at a minimum, the dollars siphoned out of the corpus for undisclosed purposes of no benefit to investors. Every dollar lifted out of the corpus reduced the net assets of the fund and reduced its ability to earn income. Defendants are correct that there was no drop in share value after the truth was revealed. That is because the underlying portfolio and its net asset value was the same just before and just after. Dressed up as fees, cash was being misappropriated from the common fund. The fees were not used for their ostensible purposes but were diverted to support ongoing distribution. The true price of admission to the fund was greater than was represented. At least that is the allegation. It is sufficient at this stage.
>
> With respect to transaction causation, the proposed pleading adequately alleges that plaintiffs would not have purchased the funds but for the concealment of the scheme. This is adequate at the pleading stage. *In re Daou Sys.*, 411 F.3d 1006, 1025-26 (9th Cir. 2005).

*Siemers*, 2007 WL 760750, at *14. *See also Siemers*, 2006 WL 2355411, at *12 ("The secret paybacks to the broker-dealers came out of the mutual funds' assets. Without any such secret diversion, the net assets of the fund would have been greater, thus saving investors money and increasing their net return on their investment…By footing the bill for the undisclosed diversions, investors were unwittingly paying extra but getting nothing in return.").

Defendants' argument that Ninth Circuit authority holding that fees are recoverable under 10(b) is also wrong, without support and runs contrary to the objective of the federal securities laws. Defs.' Mem. at 23-24. As stated by this Court:

> With respect to loss causation and damages, defendants are wrong to argue that a stock-price drop is the exclusive method for proving damages and loss causation. In churning cases under Section 10(b), for example, the Ninth Circuit has specifically approved a measure of damages based on the excess in commissions due to churning in an investment account. *Nesbit v. McNeil*, 896 F.2d 380, 385 (9th Cir. 1990). This is analogous to our case.

*Siemers,* 243 F.R.D. at 374-75.   This logic comports with the general objective of the federal securities laws to serve as the primary source of protection for investors.   *See SEC v. Zanford,* 535 U.S. 813 (2002); *see also Grandon v. Merrill Lynch, & Co.,* 147 F.3d 184, 193 (2d Cir. 1998) ("We must also seek, under § 10(b) and Rule 10b-5, to protect customers from paying excessive markups [fees] that…are fraudulent.").

## CONCLUSION

        For the reasons stated above, Plaintiffs respectfully request that Defendants' Motion to Dismiss be denied in its entirety.[13]

Dated: February 5, 2009                                        Respectfully Submitted,

                                                              **REESE RICHMAN LLP**

                                                              */s/Michael R. Reese*
                                                              Michael R. Reese (Cal. State Bar. No. 206773)
                                                              875 Avenue of the Americas, 18th Floor
                                                              New York, New York 10001

                                                              - and -

                                                              **WHATLEY DRAKE & KALLAS, LLC**
                                                              Deborah Clark-Weintraub
                                                              Elizabeth Rosenberg
                                                              1540 Broadway, 37th Floor
                                                              New York, New York 10036

                                                              ***Counsel for Plaintiffs***

---

[13] If the Court does not deny defendant's motion to dismiss in its entirety, plaintiffs respectfully requests leave to amend the complaint to cure any deficiencies identified by the Court. *See, e.g.,* Fed R. Civ. P. 15(a); *Big Bear Lodging Ass'n v. Snow Summit, Inc.,* 182 F.3d 1096, 1105 (9th Cir. 1999) ("leave should be liberally granted").