1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ARNOLD KREEK, individually and on
behalf of all others similarly situated,

        Plaintiff,

  v.

WELLS FARGO & COMPANY, WELLS
FARGO FUNDS MANAGEMENT, LLC,
WELLS FARGO FUNDS TRUST, WELLS
FARGO DISTRIBUTORS, STEPHENS,
INC., and WELLS FARGO BANK, N.A.,

        Defendants.
_____/

No. C 08-01830 WHA

**ORDER DISMISSING
CLASS ALLEGATIONS ONLY**

**INTRODUCTION**

      In this proposed class action, this is a motion to dismiss claims involving defendants'
alleged violation of federal securities laws. Plaintiff investors assert that defendants Wells
Fargo & Company and its affiliates violated Section 10(b) and Section 20(a) of the Securities
Exchange Act of 1934. On this motion to dismiss, defendants argue that plaintiffs' claims are
untimely under the two-year statute of limitations and that the complaint fails to properly plead
a violation of Rule 10b-5. This order finds that all putative class members were on inquiry notice
more than two years before the action was filed. The statute of limitations for the *individual*
claims was tolled by the filing of *Ronald Siemers v. Wells Fargo*. The *class* allegations, however,
were not tolled by *Siemers*. Accordingly, plaintiffs may continue this action as individuals but

1   the class allegations must be dismissed. The complaint otherwise states a valid claim for relief.

2   Defendants' motion to dismiss plaintiffs' individual claims is **DENIED**.

3                                          **STATEMENT**

4          This is a putative class action that arises from allegations of false and misleading

5   statements in violation of federal securities laws. Plaintiffs Edward Lee, Edward Arsenault,

6   Emil De Bacco, Richard Hinton, Arnold Kreek, and Margret Macht are investors who

7   purchased Wells Fargo Funds from November 4, 2000, through April 11, 2006, inclusive.

8   Defendants Wells Fargo & Company and its affiliates (Wells Fargo Funds Management, LLC,

9   and Wells Fargo Funds Trust) provide financial services to clients — such as banking, insurance,

10  investments, mortgage, and consumer finance services.

11         Plaintiffs allege that defendant Wells Fargo & Company is the ultimate parent of all

12  defendants named in the complaint. It was the ultimate beneficiary of the scheme to drive new

13  investors into the Wells Fargo funds through the alleged kickback scheme. Defendant Wells

14  Fargo Funds Management, LLC, is registered as an investment adviser under the Investment

15  Advisers Act and is allegedly responsible for implementing the policies and guidelines for the

16  funds at issue. Wells Fargo Funds Trust is allegedly the registrant of all the Wells Fargo funds

17  for purposes of filing financials with the SEC.

18         Plaintiffs allege that Wells Fargo and its affiliates entered into secret revenue-sharing

19  agreements with brokerages and selling agents who sold Wells Fargo Funds. Brokerages and

20  selling agents received revenue when they steered their clients into Wells Fargo Funds to the

21  exclusion of other funds better suited to their clients' interests. Defendants financed these

22  improper kickbacks by charging hidden excessive fees to their clients, which fees should have

23  instead been invested in the funds' underlying portfolio. These preexisting and ongoing

24  revenue-sharing arrangements were not disclosed to investors at the time investors purchased

25  Wells Fargo Funds.

26         From 2000 to 2006, plaintiffs each purchased shares in at least one of defendants'

27  mutual funds. Annually, each fund issued a prospectus that contained a disclosure pertaining

28  to the fund's "Fund—Objective—Principal Strategy," "Shareholder Fees" and "Annual Fund

United States District Court

For the Northern District of California

2

**United States District Court**
For the Northern District of California

1   Operating," "Organization and Management of the Funds," and "Distribution Plan."

2   A "Statement of Additional Information" (SAI) also was included with each prospectus

3   that discussed the duties of the investment advisor, investment sub-advisors, administrators,

4   distributor, and custodian and the fees to which they were entitled.  The SAIs also provided

5   information regarding defendants' shareholder-servicing plan and shareholder-servicing agents

6   as well as its rule 12b-1 plan.  In 2002, 2004, and 2005, supplemental information regarding

7   "Additional Payments" was also included in the prospectuses.  Plaintiffs allege that the

8   prospectuses and SAIs, released from 2000 to 2006 were false and misleading in identical

9   respects.  Generally, those documents did not disclose the secret revenue-sharing agreements.

10  Plaintiffs argue that if the kickback payments pursuant to the revenue-sharing agreements had

11  been disclosed to investors at the time the investments were made, no reasonable investor would

12  have invested in the funds.

13       This action is a sequel to a previous and heavily litigated action entitled *Ronald Siemers v.*

14  *Wells Fargo*, C 05-04518-WHA, which was before the undersigned until it settled on a class-wide

15  basis on August 3, 2007.

16       On April 4, 2008, the same counsel filed this action on behalf of different investors

17  but assert the same theories as to all the Wells Fargo funds that were not certified in *Siemers*.

18  Plaintiffs allege that the investment adviser and registrant adviser defendants violated

19  Section 10(b) of the Exchange Act and Rule 10b-5 by employing a revenue-sharing scheme

20  which they intended to use to defraud plaintiffs; by disseminating materially false and misleading

21  information through the instrumentalities of interstate commerce; that it profited from these

22  unlawful fees that it charged plaintiffs; had actual knowledge of the misrepresentations and

23  omissions of material facts; that plaintiffs did not have knowledge of the falsity of the

24  misrepresentations or omissions; and that plaintiffs as a direct and proximate result of defendants'

25  conduct were harmed.  Plaintiffs also allege that Wells Fargo & Company violated Section 20(a)

26  of the Exchange Act because it acted as a controlling person of the investment adviser and

27  registrant adviser defendants; investment adviser and registrant advisor defendants violated

28

3

1    Section 10(b) and Rule 10b-5; and as a direct and proximate result of investment advisor and

2    registrant advisor's conduct, plaintiffs were harmed.

3                                        **ANALYSIS**

4        1.    LEGAL STANDARD.

5        A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged

6    in the complaint.  The Supreme Court has recently explained that "[t]o survive a motion to

7    dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to

8    relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citations

9    omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows

10   the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

11   *Ibid*.  All material allegations in the complaint as well as reasonable inferences to be drawn

12   from them are accepted as true.  But this does not apply to legal conclusions.  Rather, courts must

13   examine whether conclusory allegations follow from the description of facts as alleged by the

14   plaintiff.

15       Although materials outside of the pleadings should not be considered without converting

16   the motion to dismiss to a motion for summary judgment, a district court may consider all

17   materials properly submitted as part of the complaint such as exhibits.  A district court may also

18   consider documents to which the complaint specifically refers and whose authenticity is not

19   questioned even if they are not physically attached to the complaint.  A district court may take

20   judicial notice of its own orders and of records in a case before it as well as other matters of

21   public record that are properly subject to judicial notice.  *Hal Roach Studios v. Richard Feiner*

22   *and Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).

23       In this case, this order involves a review of documents essential to the claim, documents

24   specifically referred to in the complaint, documents already in the Court's files, and published

25   reports regarding the payment of hidden brokerage fees by mutual fund companies including

26   affiliates of defendants in this case.

27

28

**United States District Court**
For the Northern District of California

2.      **STATUTE OF LIMITATIONS**.

Claims for a violation of Section 10(b) and Section 20(a) of the 1934 Act must be brought within two years of discovery of the facts constituting a violation.  28 U.S.C. 1658(b)(1). "[E]ither actual or inquiry notice can start the running of the statute of limitations on a federal securities fraud claim."  *Betz v. Trainer Wortham & Co., Inc.*, 519 F.3d 863, 869 (9th Cir. 2008).

The Ninth Circuit uses the "inquiry-plus-reasonable-diligence" test to determine whether a statute of limitations begins running due to inquiry notice.  This is a two-part objective test.  *First*, a court must determine whether the plaintiff had inquiry notice of the facts giving rise to his claim.  The *Betz* decision held that the facts constituting inquiry notice "must be sufficiently probative of fraud — sufficiently advanced beyond the stage of a mere suspicion to incite the victim to investigate."  *Id.* at 871.  *Second*, a court must ask whether "the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud."  *Id.* at 876 (citation omitted).  Under this standard, the defendant bears a considerable burden in demonstrating that the plaintiff's claim is time barred.  A ruling as a matter of law is appropriate "only when uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered the fraudulent conduct."  *Id.* at 877 (citation omitted).

A.      **Inquiry Notice**.

*In re American Funds Securities Litigation*, 556 F. Supp. 2d 1100 (C.D. Cal. 2008), is directly on point.  That decision dismissed a complaint involving an alleged violation of Section 10(b) as time barred after finding that the plaintiff investors were on inquiry notice of the defendant's alleged misconduct.  The decision found that news articles, SEC press releases, and a prior complaint filed by other investors were sufficient to put the plaintiffs on inquiry notice.  One such news article published by the Los Angeles Times, "focus[ed] on the activities of the defendants named in [that] case and on the same payments that [were] the center of their alleged wrongdoing."  *Id*. at 1105–06.  The article was held to establish "sufficient suspicion of fraud to cause a reasonable investor to investigate the matter further because it report[ed] that one of the brokerages receiving such payments . . . agreed to pay $50 million to settle SEC charges

United States District Court

For the Northern District of California

1  that it had received substantial hidden fees" from numerous companies in return for promoting

2  their funds. *Ibid.*

3      The district court in *American Funds* also noted a prior complaint filed over two years

4  before the complaint at issue and which alleged "a nearly identical scheme of wrongdoing against

5  [d]efendants." The decision held that the prior complaint "when taken together with all of the

6  other information in the public domain regarding investigations into" revenue sharing between

7  mutual fund companies "would have put anyone giving reasonable attention to the subject on

8  notice of the existence of a claim under the 1933 and 1934 Acts." *Id.* at 1109–10.

9      The facts in the present case are nearly identical to those in *American Funds*. This order

10 takes notice of the NASD's June 2005 press release, the news articles which carried that press

11 release, the prior decision in *Siemers*, and the December 2005 "Disclosure Statement" issued

12 by Wells Fargo. These documents put plaintiffs on inquiry notice by December 2005. They were

13 "sufficiently probative of fraud — sufficiently advanced beyond the stage of a mere

14 suspicion . . . to incite the victim to investigate." *Betz*, 519 F.3d at 871.

15     Plaintiffs admit to the NASD's June 2005 press release in their complaint. The complaint

16 alleges that as detailed in the NASD's press release the:

17          NASD found that the [Wells Fargo Investments], most of which
            sold funds offered by hundreds of different mutual fund
18          complexes, operated "preferred partner" or "shelf space" programs
            that provided certain benefits to a relatively small number of
19          mutual fund complexes in return for directed brokerage. The
            benefits to mutual fund complexes of these quid pro quo
20          arrangements included, in various cases, higher visibility on the
            firms' internal web sites, increased access to the firms' sales
21          forces, participation in "top producer" or training meetings, and
            promotion of their funds on a broader basis than was available for
22          other funds.

23 (Compl. ¶ 246). The press release further asserted that the fund complexes "use[d] assets of

24 the mutual funds instead of their own money to meet the[se] revenue sharing obligations"

25 (Wells Fargo Exh. A at 1). Contrary to plaintiffs' assertion, the release specifically stated that

26 Wells Fargo Investments, an affiliate of Wells Fargo & Company, was fined $2,970,000 for its

27 involvement in the scheme (*ibid.*). The story was carried by major media outlets including the

28 *Los Angeles Times*, *Associated Press*, *MarketWire*, and *PR Newswire*.

6

United States District Court

For the Northern District of California

1    Plaintiffs also rely upon Wells Fargo's December 2005 "Disclosure Statement" in their

2    complaint.  That document stated that Wells Fargo participated in revenue-sharing agreements

3    and that the "compensation arrangements [were] in addition to the sales charges and fees that

4    [were] disclosed in the fee tables, prospectuses and statements of additional information"

5    (Compl. ¶247).  According to the complaint, "Wells Fargo Investments admitted that it received

6    the payments from the Wells Fargo Funds that are at issue in this Complaint, that said payments

7    created potential conflicts of interest and that, finally, such payments were not disclosed in

8    either the Wells Fargo Funds' prospectuses or statements of additional information" (*ibid.*).

9    Other similarly situated investors in the *Siemers* case alleged that "the full extent of

10   [d]efendants' conflicts of interests were revealed" when the disclosure statement was "publicly

11   circulated" in December 2005 (Wells Fargo Exh. Y).  Moreover, the complaint alleges this

12   information under the heading "The Truth Begins to Be Disclosed."  In relying on the disclosure

13   statement in their complaint, plaintiffs have practically conceded that they were on inquiry notice

14   as of December 2005.

15   Finally, plaintiffs allege that their complaint is premised on the *Siemers* action.

16   The *Siemers* action affirms the finding that plaintiffs were on inquiry notice more than two

17   years before the filing of this action.  The first *Siemers* complaint was filed in November 2005

18   and contained substantially similar allegations of fraud against the same defendants as here.

19   Contrary to plaintiffs' assertion, it alleged the same core allegations as here, including

20   allegations of defendants' violation of Section 10b-5 of the 1934 Act and allegations of scienter

21   (Wells Fargo Exh. Z).  The *Siemers* complaint was first publicized in *PR Newswire* and the

22   *Associated Press* on November 11 and was later carried at least 19 additional times by *PR

23   Newswire* (Wells Fargo Exh. D–W).  It was also filed with the SEC in December 2005 (Wells

24   Fargo Exh. FF).  As in *American Funds*, "when taken together with all of the other information

25   in the public domain" regarding the revenue-sharing scheme, the previously-filed *Siemers*

26   complaint "would have put anyone giving reasonable attention to the subject on notice of the

27   existence of a claim" under the 1934 Act.  *American Funds*, 556 F. Supp. 2d at 1109–10.

28

**United States District Court**
For the Northern District of California

B.      **Reasonable Diligence.**

With regard to the second prong of the test for inquiry notice, plaintiffs argue that what a reasonable investor should have known is particularly suited to a jury determination and that the issue of diligence is difficult to resolve as a matter of law.  While these contentions are correct, the relevant question is "whether their application in this case on this record defeats the motion to dismiss." *American Funds*, 556 F. Supp. 2d at 1110.  In fact, there are numerous decisions where plaintiffs were found to be on inquiry notice as a matter of law on a motion to dismiss. *See, e.g., In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399 (9th Cir. 1996); *American Funds*, 556 F. Supp. 2d 1100; *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1106 (C.D. Cal. 2003); *DeBenedictis v. Merrill Lynch & Co., Inc.*, 492 F.3d 209 (3rd Cir. 2007).

In this case, the inquiry notice and reasonable diligence tests merge because of the level of detail that was disclosed by December 2005.  As stated, the NASD action, press releases, and disclosure statement revealed that Wells Fargo affiliates had participated in revenue-sharing agreements paid from fund assets not earlier disclosed in its prospectuses or SAIs.  This was and is the crux of the allegations in the complaint here and in *Siemers*.  The public record by December 2005 contained information that not only put plaintiffs on notice of fraud, but also exposed how the revenue-sharing scheme worked.  The fact that other similarly situated plaintiffs were able to file an identical action in *Siemers* by November 2005 affirms this order's finding that plaintiffs were on inquiry notice more than two years before the complaint was filed in April 2008.  Thus, absent tolling, the two-year statute of limitations ran on these claims before this action was commenced.

3.      **TOLLING**.

Plaintiffs argue that the statute of limitations was tolled by the filing of the *Siemers* complaint.  This order finds that the statute of limitations was tolled with respect to the *individual* plaintiffs in this action.  The statute of limitations was not tolled, however, for the *class* allegations.

In *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), the plaintiffs filed a class action suit with only eleven days left to run on the applicable statute of limitations.

8

**United States District Court**
For the Northern District of California

1    Class certification was later denied, and eight days after that a number of individual class

2    members moved to intervene as individuals.  The Supreme Court ruled that the filing of a class

3    action tolled the statute of limitations for all plaintiffs who filed timely motions to intervene.

4    In *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983), the Supreme Court extended

5    *American Pipe* tolling to all asserted members of the class who sought to file new but individual

6    actions following a denial of class certification —  not just to intervenors in the original class

7    proceeding.

8          While the Supreme Court has not yet considered whether *American Pipe* tolling applies

9    to subsequent *class* claims following the denial of class certification, the appellate courts have

10   generally refused to extend the tolling doctrine in most circumstances.  The Ninth Circuit

11   considered this question in *Robbin v. Fluor Corp*, 835 F.2d 213 (9th Cir. 1987).  It held:

> Robbin asserts that the policy considerations underlying the tolling
> doctrines of *American Pipe* and *Crown, Cork* should be extended
> to include class members who file subsequent class actions.  This
> position has been squarely rejected by several courts . . .  We agree
> with the Second Circuit that to extend tolling to class actions "tests
> the outer limits of the *American Pipe* doctrine and . . . falls beyond
> its carefully crafter parameters into the range of abusive options."
> We therefore affirm the district court's dismissal of *Robbin*'s class
> action.

17   *Ibid* (citing *Korwek v. Hunt*, 827 F.2d 874 (2nd Cir. 1987)).  The reasoning, as stated by *Korwek*,

18   was that putative class members may *not* "piggy-back one class action onto another and thus toll

19   the statute of limitations indefinitely."  *Id.* at 878.

20         In *Catholic Social Services, Inc. v. INS*, 232 F.3d 1139 (9th Cir. 2000), the Ninth Circuit

21   again considered the question of whether *American Pipe* tolling applies to subsequent class

22   claims following the denial of class certification.  This time it cut out a narrow exception to

23   *Robbin*.  In *Catholic Social Services*, the plaintiffs in a prior action filed a class action claim.

24   After the class had already been certified, Congress stripped federal courts of jurisdiction over

25   the named plaintiffs in that action.  A new class action was filed with named plaintiffs that met

26   the new jurisdictional requirements.  Even though the statute of limitations had run, the decision

27   tolled the statute of limitations for the subsequent class action.  The Ninth Circuit, however,

28   re-affirmed *Robbin*.  *Catholic Social Services* was careful to reiterate its holding that *American*

*Pipe* tolling does not apply when the plaintiffs are "attempting to relitigate an earlier denial of class certification or to correct a procedural deficiency in an earlier would-be class." *Id.* at 1149.

Here, plaintiffs are attempting exactly what *Robbin* and *Korwek* foreclosed — they are attempting to relitigate an earlier denial of class certification in *Siemers*. *Korwek* is directly on point. That decision involved plaintiffs who had previously filed a lawsuit alleging a broad class. In the prior action, a class certification order had "drastically limited the scope of the class certified largely because of what it adjudged to be significant problems of manageability," among other reasons. In *Korwek*, those plaintiffs who were denied certification in the prior action filed a subsequent class action which asserted "claims virtually identical to those previously asserted in [the prior action] and name[d] nearly all of the same parties as defendants." The decision in *Korwek* held that the statute of limitations did not toll for the subsequent class action.

Here, as in *Korwek*, *Siemers* was filed as a broad class consisting of purchasers of more than seventy Wells Fargo mutual funds. *Siemers* eventually certified a narrower class consisting of only the purchasers of the mutual funds held by the lead plaintiff — three funds in all. In the present case, like in *Korwek*, a new group of lead plaintiffs are attempting to cure the deficiencies in the prior action. Plaintiffs seek to certify the same class that *Siemers* had already found inappropriate for certification. The similarities between the two actions are readily apparent. *First*, as in *Siemers*, the proposed classes consist of purchasers of approximately seventy Wells Fargo mutual funds. *Second*, the proposed class period extends for nearly the same length as that in *Siemers* — from November 2000 through April 2006.[1] *Third*, plaintiffs bring the exact same claims and legal theories as those raised in *Siemers*. Indeed, the first page of the complaint states that it is premised on the Third Amended Complaint in the *Siemers*

---

[1] The proposed class period in the present action extends five months longer than in *Siemers* due to plaintiffs' allegations that Wells Fargo did not cease its illegal practices until a few months after the filing of the *Siemers* action. This is insignificant. For all intents and purposes, the proposed class periods for the two actions are identical.

United States District Court
For the Northern District of California

1  action.  As in *Korwek*, the present case reduces to an attempt to relitigate the prior denial of class

2  certification in *Siemers*.[2]

3      *American Pipe* tolling cannot be extended to allow plaintiffs in this case to relitigate the

4  earlier denial of class certification.  The class allegations are therefore time-barred.  But the

5  statute of limitations was tolled for the individual plaintiffs pursuant to *American Pipe*.

6  Accordingly, those plaintiffs may proceed in this action as individual plaintiffs.

7          **4.      SUFFICIENCY OF THE COMPLAINT.**

8      Defendants challenge the sufficiency of the complaint on multiple grounds.  They argue

9  that the complaint fails to properly allege that the purported omissions and misrepresentations

10  were material, that the complaint fails to adequately plead reliance, that the complaint fails to

11  adequately plead scienter, that the complaint fails to plead the *Gartenburg* factors with

12  particularity, and that the complaint fails to adequately plead causation.  Each of defendants'

13  challenges were considered and rejected by *Siemers*.  Given that the complaint in the present

14  action is nearly identical to the complaint that survived these same attacks in *Siemers*, this order

15  finds that the complaint is well beyond the threat of a Rule 12(b) dismissal.

16          **A.      Materiality of Defendants' Omissions.**

17      Defendants argue that plaintiffs fail to allege the materiality of any statements or

18  omissions with sufficient particularity "as to any plaintiff, any prospectus, or any purchase or

19  sale of any Wells Fargo Fund."  This argument is rejected.

20      To prevail on a 10b-5 claim, plaintiffs must allege with particularity that the statements

21  or omissions at issue were misleading as to material facts.  *Basic Inc. v. Levinson*, 485 U.S. 224,

22  238 (1988).  A statement is material only if "there is a substantial likelihood that the disclosure

23  of the omitted fact would have been viewed by a reasonable investor as having significantly

24

25

26      [2] Plaintiffs attempt to distinguish this action on the grounds that the new class is comprised of nine
subclasses.  This argument fails.  They do not cite any Ninth Circuit authority where a subclass was tolled under
27  *American Pipe*.  Furthermore, the proposed subclasses are the exact same size and scope as the proposed class
in *Siemers*.  The same manageability concerns exist.  Calling the proposed class different than that in *Siemers* is
28  a smoke-and-mirrors argument.  This action is an attempt to relitigate the prior denial of class certification.

11

altered the total mix of information made available." *Miller v. Thane Int'l. Inc.*, 519 F.3d 879

(9th Cir. 2008).

Here, the complaint alleges that Wells Fargo made $350 million in secret kickback

revenue-sharing payments during the class period. This was material. These secret payments

exemplify the principal wrong — that the fees were not being used for their stated purposes.

The payments not only shrank plaintiffs' investments but they also created conflicts of interest

that any investor would want to know about before deciding to invest in Wells Fargo mutual

funds. As *Siemers* reasoned:

> The defense insists that unless we know the extent of the excess,
> we cannot tell whether the amounts would have been material.
> Maybe, they suggest, the excess was tiny. We must not forget that
> defendants themselves refer to the payments at issue as
> "significant." This was set forth in most of the prospectuses at
> issue. Although those disclosures were allegedly inadequate in
> multiple ways, they repeatedly referred to the payments as
> "significant." Defendants may not walk away from these
> admissions. Moreover, any intentional misappropriation from the
> common fund would have been material to investors. The integrity
> of management is always of importance to investors. That a
> fiduciary has been misappropriating the common fund — even in
> small amounts — would be important to investors, for the next
> misappropriation or defalcation could be larger. Intentional
> misappropriation would always be a red flag, a negative factor of
> material interest to investors.

*Siemers*, 2007 WL 1140660, at *8. That reasoning still stands. Accordingly, the complaint

alleges materiality with adequate particularity.

## B. Reliance.

To adequately plead reliance in a 10b-5 claim, plaintiffs must "prove that the alleged

misrepresentations induced them to do something different from what they would otherwise

have done in making investment decisions." *In re Nations Mart Corp. Sec. Lit.*, 130 F.3d 309,

321 (8th Cir. 1998). Generally, the complaint must plead individual reliance by the plaintiffs.

But the Supreme Court recognized an exception to this rule in *Affiliated Ute Citizens of Utah v.

United States*, 406 U.S. 128 (1972). That decision permitted a presumption of reliance where the

defendant omitted material information from its communications with the plaintiff. It held that,

in those circumstances, "proof of reliance is not a prerequisite to recovery. All that is necessary

United States District Court

For the Northern District of California

is that the facts withheld be material in the sense that a reasonable investor might have

considered them important in the making of this decision." *Id.* at 153–54.

Here, the action falls within the *Ute* exception. *Siemers* again is directly on point.

That decision held:

> Movant's argument conflicts with the express command of the
> Supreme Court in *Affiliated Ute Citizens of Utah*, which held that
> "positive proof of reliance is not a prerequisite" when the case
> involves "primarily a failure to disclose," not exclusively a failure
> to disclose. This order holds that plaintiff need not make
> independent allegations of reliance because he adequately pleads
> causation by accusing defendants of material omissions resulting
> in half truths.

*Siemers*, 2006 WL 2355411, at *11. The facts are the same here. As stated, defendants'

material omissions, the secret revenue-sharing agreements, resulted in half truths for the

purposes of *Ute*. Accordingly, the complaint adequately pleads reliance.

## C. Scienter.

To plead the requisite facts for scienter, a complaint must allege that the defendant made

false or misleading statements either intentionally or with deliberate recklessness. In 2007, the

Supreme Court explained that the PSLRA requires a stringent pleading standard for scienter.

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007). It held that the complaint

"must plead facts rendering an inference of scienter at least as likely as any plausible opposing

inference." *Id*. at 2513. The Ninth Circuit has reasoned that the *Tellabs* standard requires a

plaintiff to "plead a highly unreasonable omission . . . which presents a danger of misleading

buyers or sellers that is either known to the defendant or is so obvious that the actor must have

been aware of it." *Zucco Partners, LLC v. Digimarc Corp.*, ___ F.3d ___, 2009 WL 57081,

at *6 (9th Cir. Jan. 12, 2009).

The complaint adequately pleads scienter within the standard set forth in *Tellabs*.

Wells Fargo and its key officers knew about its secret revenue-sharing program. They knew

it was inadequately disclosed in the prospectuses. These secret agreements were part of a

persistent and deliberate scheme to use half truths to conceal a thriving system of kickbacks.

Moreover, those inadequate disclosures were not the result of simple, or even inexcusable

13

United States District Court

For the Northern District of California

1   negligence.  The way in which the secret program was buried in the prospectus indicates that

2   defendants deliberately chose to hide it from the investors.  As recognized in *Siemers*, "[t]hat

3   they went to some trouble to allude to [the agreements] in vague and incomplete language and

4   buried the passages in unexpected placements indicates that they knew of its significance, yet

5   chose to mislead."  *Siemers*, 2007 WL 1140660, at *12.  These facts raise a strong inference of

6   intentional misleading by defendants on a "material investment decision."

7                   **D.     *Gartenburg* factors.**

8          Defendants argue that plaintiffs fail to allege with particularity that the fees were

9   excessive under *Gartenburg v. Merrill Lynch Asset Management*, 694 F.2d 923 (2nd Cir.

10  1982).  But *Gartenburg* does not require those factors to be proved at the pleading stage.

11  Defendants have not identified any decisions to the contrary.  Indeed, *Siemers* recognized

12  that "there is no requirement that the *Gartenburg* factors be pled and no decision so holds.

13  That decision came after a full trial and was not a pleading case.  Moreover, it involved

14  Section 36(b), not the 1933 and 1934 Acts."  *Siemers*, 2007 WL 760750, at *13 (citing

15  *Gartenburg*, 694 F.2d 923).  Defendants go through great lengths to explain what must be

16  proven at trial.  But this is not at issue.  Their argument fails.

17                  **E.     Causation.**

18         Damages in Rule 10b-5 claims are limited to cognizable economic losses that are

19  attributed to the fraud of the defendant.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005).

20  The complaint pleads that at a minimum plaintiffs' losses were equal to the money taken from

21  the mutual fund to pay for the secret revenue-sharing agreements.  This is adequate for the

22  pleading stage.

23         Defendants argue that loss causation damages are adequate only if the plaintiff alleges

24  that the defendants' fraud caused the value of the securities to drop.  Their reliance on *Dura* is

25  inapposite.  That decision merely stands for the proposition that "a plaintiff must prove that the

26

27

28

1  defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's

2  loss." *Dura,* 544 U.S. at 346. As *Siemers* explained:

3         One measure of loss causation approved by the Supreme Court
           was the familiar story of a plummet in the share price after the
4         truth became known. That, however, was only one way to plead
           loss causation, not the only way. The Supreme Court stated that
5         "ordinary pleading rules are not meant to impose a great burden
           upon a plaintiff" and that "it should not prove burdensome for a
6         plaintiff . . . to provide a defendant with some indication of the loss
           and the casual connection that the plaintiff has in mind." *Dura*
7         *Pharm., Inc. v. Broudo,* 544 U.S. 336 (2005).

8         Here, plaintiffs have provided such an indication. They allege that
           the loss was, at a minimum, the dollars siphoned out of the corpus
9         for undisclosed purposes of no benefit to investors. Every dollar
           lifted out of the corpus reduced the net assets of the fund and
10        reduced its ability to earn income. Defendants are correct that
           there was no drop in share value after the truth was revealed.
11        That is because the underlying portfolio and its net asset value was
           the same just before and just after. Dressed up as fees, cash was
12        being misappropriated from the common fund. The fees were not
           used for their ostensible purposes but were diverted to support
13        ongoing distribution. The true price of admission to the fund was
           greater than was represented. At least that is the allegation. It is
14        sufficient at this stage.

15  *Siemers*, 2007 WL 760750, at *14. The complaint in *Siemers* is substantially similar to the

16  present complaint with regards to loss causation. The reasoning in *Siemers* still applies.

17  The pleadings are sufficient.

18        The complaint states a claim under Rule 10b-5 with adequate particularity. Accordingly,

19  defendants' motion to dismiss this claim is denied.

20                                **CONCLUSION**

21        This order finds that plaintiffs were on inquiry notice no later than December 2005 —

22  more than two years before the filing of this action. Plaintiffs' *individual* claims were tolled by

23  the filing of *Siemers*. The *class* claims, however, were not tolled by the filing of *Siemers*.

24  Accordingly, plaintiffs may continue in this action as individuals but the class allegations are

25  dismissed. Because the class allegations are untimely, they are dismissed without leave to

26

27

28

**United States District Court**
For the Northern District of California

15

amend.  The complaint otherwise states a valid claim for relief.  Defendants' motion to dismiss

plaintiffs' individual claims is thus **DENIED**.

**IT IS SO ORDERED.**

Dated:  August 19, 2009.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court

For the Northern District of California

16